# IN THE OREGON TAX COURT

## REYNOLDS METALS COMPANY
*v.*
## DEPARTMENT OF REVENUE
(TC 1895)

Trial held October 19, 1983, continued on October 20 and 21, 1983, in the courtroom of the Oregon Tax Court, Salem.

Allan Hart, Carol A. Hewitt and David T. Douthwaite, Lindsay, Hart, Neil & Weigler, Portland, represented plaintiff.

G. F. Bartz, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for plaintiff rendered April 5, 1984.

## SAMUEL B. STEWART, Judge.

The plaintiff appealed the defendant's Opinion and Order No. VL 82-1200 affirming the Multnomah County Board of Equalization's determination that the true cash value of the subject property was $66,038,784 on January 1, 1980. The subject property consists of the buildings and real property improvements and the machinery and equipment at plaintiff's aluminum reduction plant located in Troutdale, Oregon. The plaintiff alleged in its complaint that the value of the plant did not exceed $38,393,000 on the assessment date. However, at the time of trial, plaintiff asserted a value of $40,567,000. The defendant contended at trial that the true cash value on the assessment date was $82,134,600.

The subject plant was built in 1941 and leased by the plaintiff for four years before purchasing it in 1949. (Plaintiff's Exhibit 10, at 16.) The plant produces primary aluminum by the Hall-Herault electrolysis process. On January 1, 1980, the plant had 700 reduction cells or pots in five potlines with a designed capacity of 130,000 tons and an operating capacity of 134,000 tons annually.

The parties agreed that the appropriate method for valuing the subject property was the cost approach. Plaintiff's expert witness, Mr. Alexander Hazen, Executive Vice President of International Appraisal Company, estimated replacement cost of the subject property to be $225,924,000. (Plaintiff's Exhibit 10, at 77.) Mr. Dean Schmidt, industrial appraiser, Department of Revenue, testifying for the defendant, estimated replacement cost at $218,368,000. (Defendant's Exhibit A, at 5.)

Both parties calculated a replacement cost of the subject property based upon invested dollars per ton of capacity in the replacement plant. The plaintiff's appraiser used $1,686 per ton and the defendant's appraiser used $1,679 per ton. (Stipulation, at 3.)

There was little difference between the appraisers' estimates of per ton costs. However, Mr. Hazen multiplied his

estimated per ton cost by 134,000 tons, the plant's operating capacity (Plaintiff's Exhibit 10, at 77), while Mr. Schmidt multiplied his per ton cost by the plant's designed capacity of 130,000 tons per year. (Defendant's Exhibit A, at 5 and Tr 361.) Testimony was given that typically there is some difference between the design capacity of aluminum reduction plants and their actual production. (Tr 32.) The subject plant's design capacity is 130,000 tons annually and it is undisputed that the actual production exceeded the design capacity in several instances. Defendant's replacement plant, with the same design capacity as the subject plant, seems the better choice in an estimate of replacement cost.

Even with the difference in the design capacity of the parties' replacement plants, the estimated replacement costs were only some three percent apart. The extreme difference in true cash value estimates results from the appraisers' differing measurements and applications of physical depreciation, functional obsolescence and economic obsolescence. The court will consider these issues separately.

## PHYSICAL DEPRECIATION

Plaintiff's appraisal of the subject property was made by a team consisting of Mr. Hazen and two associates who visited the plant in October 1979. They spent several days at the plant observing the physical condition of the subject property. While at the facility, the team arrived at an overall rating in order to estimate the physical deterioration for a given functional area. (Tr 168.) The on-site notes and work papers were offered as Exhibits 11(A), 11(B) and 11(C). Based upon the observations of the subject property's physical condition, the team made two age-life analyses of the plant's accrued depreciation. One analysis involved a study of the plant's 10 principal cost centers or "functional areas." (Plaintiff's Exhibit 10, at 89.)

Estimates were made of the life expectancies of each of the component facilities in each functional area. An appropriate portion of the plaintiff's estimated total replacement cost was allocated to each functional area and then to each of its principal components. A percent of depreciation was estimated for each component. Mr. Hazen then multiplied the original life expectancy by the estimated percentage of depreciation to arrive at an estimated "effective age." The

effective age of the component was weighted by its percentage of cost that the component bore to the total replacement cost. From this age-life analysis, Mr. Hazen concluded that the subject property was 56 percent depreciated on January 1, 1980. (Plaintiff's Exhibit 10, at 89.)

The defendant's appraiser, Mr. Schmidt, estimated the physical condition of the plant by estimating a reproduction cost. He then estimated the physical condition of the components, weighting the cost of each component by its physical percent good. By dividing the physically depreciated reproduction cost by reproduction cost new, he determined that the subject property was 45 percent depreciated on January 1, 1980. (Defendant's Exhibit A, at 5-6.)

Mr. Schmidt testified that he and a colleague, Mr. Bert Jacobson, visited the subject plant in October 1979 and that his duty was to verify the information listing the buildings and structures, add any new buildings not in the field listing and observe the physical condition of those listed items. (Tr 481.)

Defendant's Exhibit B, containing a listing of well over a hundred pages of items to be valued at the subject plant, shows no written description of their physical condition. Mr. Schmidt was asked if he had any description of the physical conditions of these hundreds of items anywhere in his notes. He replied in the negative. (Tr 488.) In addition, the witness testified that the asset list, approximately 150 pages, carries no notation regarding percent good or percent bad. (Tr 494.) The judgment regarding the physical condition of dozens of buildings was recorded when the summary was made in June 1980, some seven months after Mr. Schmidt's visit to the subject property. (Tr 494-495.)

Mr. Schmidt testified that Mr. Jacobson verified and observed the machinery and equipment at the subject plant and his field notes (Defendant's Exhibit B) contain no description of physical condition. (Tr 504.) Except for minor variances, the percentage estimate of depreciation for each item of machinery and equipment was determined back in the appraiser's office several months later. (Tr 506.)

■ It stretches credibility to claim that observed depreciation of hundreds of items and dozens of buildings can

be accurately determined months later, away from the subject property, without the aid of notes regarding the physical condition when viewed. Therefore, the court accepts the plaintiff's estimate that the subject property was 56 percent depreciated on January 1, 1980.

## FUNCTIONAL OBSOLESCENCE

In order to measure functional obsolescence, both parties estimated excess operating costs incurred because of operating inefficiencies. The parties agreed that there was functional obsolescence in six categories: (1) power consumption, (2) maintenance materials, (3) pot relining costs, (4) labor costs, (5) carbon consumption, and (6) gas consumption. (Plaintiff's Exhibit 10, at 112-116; Defendant's Exhibit A, at 26-28.)

The plaintiff calculated its estimate of excess operating costs on the basis of 134,000 tons. The defendant based its excess costs on the subject property's designed capacity of 130,000 tons annually. The plaintiff's and the defendant's estimates of excess operating costs were rather close, $22,850,350 and $21,652,244, respectively. The difference is due to the annual production figures used as a basis for the parties' calculations.

The court questions the use of plaintiff's reliance on a one-year production in calculating excess operating costs. By plaintiff's own admission, actual production figures, the output of aluminum, varied considerably for the years 1976 through 1979. 1977 production was significatnly lower than the other three years because of equipment failure and adverse water conditions. (Plaintiff's Opening Brief, at 38.) Such conditions may certainly occur again. The court agrees with the defendant's allegation that year-to-year fluctuations are normal and that a more accurate measure of the subject plant's production will result if more than one year's performance is considered. The court accepts the defendant's estimate of excess operating costs in the six categories enumerated above based upon 130,000 tons annually as being the more persuasive. These excess costs totalled $21,652,244. (Defendant's Exhibit A, at 30.)

As a setoff to these excess costs, Mr. Schmidt included depreciation and property taxes as "negative costs,"

thereby reducing his estimate of excess operating costs. (Defendant's Exhibit A, at 30.) The witness testified that the reason for including depreciation was that "in order to realize the cost savings * * * in the previous six considerations [six categories listed above], * * * an owner would be required to invest $218,000,000. * * * [T]hey must have a return of capital * * * and that is a real cost associated with owning real property improvements." (Tr 445, lines 13-19.)

Mr. Schmidt included the property tax as "a negative cost" because "it's an unavoidable cost of owning property and owning that asset that would give you these cost savings. * * * You must consider the advantages and disadvantages of owning both plants." (Tr 446, lines 3-9.)

■ Despite this statement, Mr. Schmidt ignored the fact that there may be some tax advantages for the business enterprise, such as *accelerated write-off on the federal tax return and investment tax credit.* In response to the question "[d]id you ever even think about tax benefiting the depreciation to the new company?" the witness answered "[n]o." (Tr 577, lines 5-7.) It is unreasonable for the defendant to tax effect excess operating costs (by applying depreciation and property taxes as offsets) without allowing tax benefits available to a new plant. Defendant's "negative costs" are not allowed in this instance.

The excess costs of operating the subject plant due to obsolescence represents additional income that the plant would generate if it were a state-of-the-art plant. Therefore, an adjustment to the gross excess operating costs thus adopted by the court, $21,652,244, must be made to account for the effect of federal and state income taxes. The plaintiff utilized a tax adjustment of 50 percent, the statutory rate. (Plaintiff's Exhibit 10, at 117.) The defendant contended that a tax rate of 36.75 percent was proper. The defendant based this contention upon an average of the plaintiff's effective tax rate for 1976 through 1979, alleging that the burden of the excess operating costs would be on the earnings of the plaintiff and any loss in potential value would go to the owners of the plant. (Defendant's Exhibit A, at 31.)

The paramount issue facing the court in the case at hand is the determination of the true cash value of the subject property. ORS 308.205 defines "true cash value" as "the

market value of the property as of the assessment date." Defendant's OAR 150-308.205-(A) defines market value as "the highest price * * * a property will bring * * * in the open market * * * where both parties * * * are under no undue compulsion * * * and are * * * reasonably well-informed."

A well-informed buyer would be aware of the excess operating costs of the subject plant but it appears unlikely that plaintiff's effective tax rate would influence a buyer's estimate of value. The statutory rate would have to be considered by a prospective buyer. The plaintiff's use of the statutory tax rate appears the more logical estimate and utilizing this 50 percent adjustment results in a determination that net excess operating costs equaled $10,826,122.

In order to process the net operating costs into an estimate of functional obsolescence, one must determine the remaining economic life of the property and the appropriate rate of return for the subject industry.

■ The defendant estimated a 10-year economic life because "it is the longest time that is reasonable considering the conditions at this plant." (Defendant's Exhibit A, at 33.) The plaintiff projected a useful life of 10 years for the subject property, but alleged that a prudent investor, as of January 1, 1980, "would not project a continued life beyond the expiration of the then existing power contract with BPA." (Plaintiff's Exhibit 10, at 117.) Therefore, the plaintiff alleged that the remaining economic life would be no more than seven years.

The plaintiff based its estimate of economic life on the fact that on the assessment date its power contract with Bonneville Power Administration was due to expire on December 31, 1986. The plaintiff alleged that Bonneville Power Administration had announced, in 1976, that it could not enter into new power contracts with the aluminum industry when the existing contracts expired. The plaintiff alleged that the enactment of a regional power bill pending in Congress on January 1, 1980, was problematical. (Plaintiff's Exhibit 10, at 107.)

Mr. Schmidt contended that there would be adequate power for the subject property for 10 years. He admitted that he had no understanding of the regional power bill as of

January 1, 1980, but testified that "if the bill had not passed and they were required to get their power elsewhere * * * I think they could have used some influence and possibly started a PUD so that they would have continued their power." (Tr 585, lines 19-24.) The witness admitted that he had made no attempt to ascertain if the formation of a PUD in Troutdale was possible.

Considering the evidence offered, the court finds that the economic life of the subject property on January 1, 1980, was seven years. The court must now determine the proper capitalization rate to be applied, that is, the cost of capital to the plaintiff on the subject date.

Dr. Shannon P. Pratt, testifying for the plaintiff, estimated that the appropriate capitalization rate was 12.6 percent. He based this estimate upon a study of three aluminum companies that he deemed most comparable to the plaintiff, analyzing their capital structures as to debt and equity and developing an average. (Plaintiff's Exhibit 15, at 3.) He alleged that the weighted cost of capital was 12.6 percent. (Plaintiff's Exhibit 15, Table VII, at 14.)

The defendant's appraiser developed his capitalization rate by finding a four-year average of the plaintiff's return on invested capital and weighting that with the plaintiff's 1979 return and with estimates of returns on capital as found in *Forbes* magazine of January 7, 1980. From this study, Mr. Schmidt concluded that the weighted return on capital was eight percent. (Defendant's Exhibit A, at 32.) He then added a 10 percent factor "because there's a remaining economic life of 10 years and you have to put that factor in." (Tr 452, lines 12-14.)

Dr. Pratt contended that the cost of capital is a return on capital and does not include a return of capital. He alleged that the cost of capital consists of (1) a rent on the money, (2) an inflation component, and (3) a risk component. (Tr 313, lines 19-25 and Tr 314, lines 3-4.)

The plaintiff's estimate of the proper capitalization rate is better supported and more convincing than defendant's. Therefore, the court finds that the net excess costs should be capitalized at 12.6 percent for seven years.

Plaintiff alleged that the correct measure of the

present value of the income stream in this instance was based upon continuous compounding. (Tr 314.) Defendant alleged that capitalizing costs on a continuous basis was not correct. (Tr 454.) Testimony presented and evidence offered resulted in plaintiff's position being the better supported in this instance.

Therefore, the court adopts plaintiff's present value factor of 4.7555 which results in a finding that functional obsolescence of the subject property equalled $51,483,623 on January 1, 1980.

## ECONOMIC OBSOLESCENCE

The next issue for determination is that of economic obsolescence. The plaintiff alleged that an economic obsolescence penalty should be applied because of the critical power situation in the Pacific Northwest. (Plaintiff's Exhibit 10, at 118.) The plaintiff's witness stated that the uncertain availability of power reduced the economic life of the subject property by at least three years. Therefore, a penalty of 10 percent was estimated.

The defendant contended that there was no economic obsolescence at the plant. (Tr 460.) It was Mr. Schmidt's opinion that there would be adequate power for Bonneville to supply the Reynolds' plant for a period fo 10 years which he estimated was the economic life of the plant. (Tr 584.)

The court feels that the possibility of a shortage of energy seven years after the assessment date in question, the time when plaintiff's contract with Bonneville Power Administration expired, has been well documented and a potential purchaser would have been aware of the problem from public records. However, the plaintiff's estimate that a 10 percent penalty should be applied in the form of an economic obsolescence factor has little supporting data to confirm this figure. In addition, the plaintiff considered this negative factor by using a seven-year economic life in determining the present worth figure to be applied to the excess costs even though plaintiff admitted the subject property had a 10-year useful life.

If the energy problem also contributed to an economic obsolescence factor, the plaintiff has failed to prove by a preponderance of the evidence as required by ORS 305.427

that 10 percent is the correct deduction. Therefore, no economic obsolescence factor will be applied in determining the true cash value of the subject property.

The following outline summarizes the court's findings:

| | | |
|---|---|---:|
| Replacement Cost | | $218,368,000 |
| Less physical depreciation (56%) | | 122,286,080 |
| | | $ 96,081,920 |
| | | |
| Total excess operating costs | $21,652,244 | |
| Less excise tax adjustment (50%) | 10,826,122 | |
| Net excess operating costs | $10,826,122 | |
| | | |
| Net excess operating costs capitalized at 12.6% for seven years (functional obsolescence) | | 51,483,623 |
| | | $ 44,598,297 |
| | | |
| True Cash Value on 1-1-80 (rounded) | | $ 44,600,000 |

The true cash value of the subject property on January 1, 1980, is $44,600,000. The assessment and tax rolls should be corrected in line with this determination and if taxes have been paid in excess of those due and owing, they shall be refunded, with statutory interest thereon, as provided by ORS 311.806 and 311.812.

One issue remains for the court's determination. Should the certified pollution control equipment exemption be deducted from the true cash value of the plant equipment or from the assessed value thereof?

The Environmental Quality Commission granted the plaintiff a tax exemption certificate for its pollution control equipment totaling $28,009,900. (Opinion and Order No. VL 82-1200, at 10.) ORS 307.405(1) states:

"A pollution control facility * * * certified by the Environmental Quality Commission * * * [is] exempt to the extent of the highest percentage figure certified * * * as the portion of the actual cost properly allocable to the prevention, control or reduction of pollution."

Plaintiff alleges that the exemption reduces the assessed value, not the true cash value, because "the property

tax exemption statutes so state when the exemptions are to be deducted from the true cash value * * * of the property." (Plaintiff's Memorandum of Law on Amount of and Application of Pollution Control Exemption, at 6.)

Plaintiff offers as support for this allegation the fact that an exemption statute for fallout shelters provided that "[t]he exemption allowed shall not exceed $1,500 true cash value per shelter." (1961 Or Laws ch 598, § 3, codified as ORS 307.169(3).) During the same legislative session, ORS 308.232 was amended to assess all real and personal property at 25 percent of its true cash value. (1961 Or Laws ch 243, § 1.) Therefore, the legislature designated its intended application of the "shelter" exemption.

When the "pollution control exemption" statute was passed (1967 Or Laws ch 592, § 13), ORS 308.232 was also amended to read: "All real or personal property within each county shall be assessed at 100 percent of its true cash value." (1967 Or Laws ch 293, § 6.) Therefore, it was not necessary for the legislature to designate whether the pollution control exemption was to be applied to a true cash value or an assessed value since they were one and the same.

It is noted that, in 1975, the legislature allowed an exemption for property equipped with an alternative energy system (1975 Or Laws ch 460, §§ 1 and 2, codified as ORS 307.175). This exemption was based on subtracting the allowable amount from the true cash value of the property. At the time this statute was formulated, ORS 308.232 remained unchanged, requiring property to be assessed at 100 percent of its true cash value.

In 1979, ORS 308.232 was amended to provide that all real and personal property should be assessed at a percentage of its true cash value. (1979 Or Laws ch 241, § 33.) It would have been helpful, indeed, if the legislature had clarified its intent regarding application of the pollution control exemption at this time.

The plaintiff contends that footnote 7 found in *Tharalson v. State Dept. of Rev.*, 281 Or 9, 573 P2d 298 (1978), requires that the subject exemption be deducted from assessed value, not true cash value. The footnote states that: "The effect of an exemption, as that term is normally used in

taxation, is to reduce the net taxable amount to which the tax rate is applied." *Tharalson,* concerning an exemption from state inheritance taxes, is distinguishable from this case, involving ad valorem taxes. In addition, the court's placement of the above-quoted statement suggests that it was intended as dicta.

In the matter of tax exemptions such as are involved here, Oregon is a "strict construction" state. *Portland Gen. Elec. Co. v. Dept. of Rev.,* 7 OTR 33 (1977).

Taxation of property is the rule and exemptions are the exception and are matters of legislative grace. *Skyline Assembly of God v. Dept. of Rev.,* 274 Or 259, 545 P2d 879 (1976).

Tax exemption statutes will be construed reasonably to determine legislative intent but in case of doubt will be construed against the taxpayer. *Eman. Luth. Char. Bd. v. Dept. of Rev.,* 263 Or 287, 502 P2d 251 (1972).

A rule of statutory construction requires "exemptions from taxation to be express." *Johnson v. Dept. of Rev.,* 292 Or 373, 639 P2d 128 (1982). The exemption application desired by plaintiff is not an "express" one. In this case of doubt, the determination will be construed against the taxpayer.

The court finds that the exemption allowed by ORS 307.405(1), as pled by the plaintiff and decreed by defendant's Opinion and Order No. VL 82-1200, in the amount of $28,009,900 shall be subtracted from the true cash value as found by this court.