Argued and submitted November 6, 1984, modified and remanded August 20, reconsideration allowed November 26, 1985 (300 Or 250)

# REYNOLDS METALS COMPANY,
*Respondent,*

*v.*

# DEPARTMENT OF REVENUE,
*Appellant.*

## (TC 1895; SC S30875)

705 P2d 712

G. F. Bartz, Assistant Attorney General, Salem, argued the cause for appellant. With him on the briefs was Dave Frohnmayer, Attorney General, Salem.

Allan Hart, Portland, argued the cause for respondent. With him on the brief were Carol A. Hewitt, David T. Douthwaite, and Lindsay, Hart, Neil & Weigler, Portland.

LENT, J.

## LENT, J.

In this appeal by the Department of Revenue (Department) from a decree of the Oregon Tax Court, we are presented with two major issues of fact and one issue of law. We are required to determine the true cash value of the plaintiff taxpayer's plant, *i.e.*, its buildings and machinery and equipment as of January 1, 1980. The major issues of fact are the dollar value of physical depreciation and the dollar value of functional obsolescence in the plant. The issue of law concerns the proper credit for ad valorem tax purposes for pollution control equipment installed by the taxpayer in 1978-79.

The value of this plant as of January 1, 1968, was before us in *Reynolds Metals v. Dept. of Rev.*, 258 Or 116, 477 P2d 888, 481 P2d 352 (1971). We found the value to be $13,844,201. Major capital changes have been made in the plant since that time by way of the installation of a fifth potline in 1973 and a pollution control system in 1978-79. The assessed value of the plant as of January 1, 1979, was $51,820,690.

The Multnomah County Assessor, based on an appraisal by employees of the Department, found the true cash value as of January 1, 1980, to be $70,308,100, a one-year increase in true cash value of $18,487,410. The taxpayer petitioned the Board of Equalization for relief, and the Board reduced the true cash value to $66,038,784.

The taxpayer then appealed to the Department, and the Director affirmed the Board.

The taxpayer brought the instant action in the Oregon Tax Court, alleging that the true cash value was not more than $38,393,000. On trial the taxpayer's evidence before the court was that the true cash value was $40,467,000. The Department's evidence was that the true cash value was $82,134,600. The court found the true cash value as of January 1, 1980, to be $44,600,000. The court further found that the Environmental Quality Commission had granted the taxpayer a tax exemption certificate for its pollution control equipment in the amount of $28,009,900. The court held that the taxpayer was entitled to deduct that amount from the true cash value fixed by the court, thus arriving at the amount of

$16,590,100 as the amount on which the taxpayer should pay ad valorem taxes on its plant for the tax year in question.[1]

■    The Department has appealed to this court under ORS 305.445,[2] and we are required to try the cause anew on the record under that statute and ORS 19.125.

The plant site is located on 88 acres in the city of Troutdale 18 miles east of Portland.[3] The plant is an aluminum reduction facility producing primary (pig) aluminum by the Hall-Heroult electrolysis process. The plant was originally constructed in 1941-42 by the Aluminum Company of America (Alcoa). In 1946, this taxpayer acquired a lease to the plant, and then purchased it in 1950 and has owned and operated it ever since. When the plant was built, it had four potlines, each with two potrooms. There were 128 pots in each potline (totaling 512), producing 72,000 tons of aluminum annually. In the 1950s, 48 more pots were added, and in 1973 a fifth potline went into operation, housed in two potrooms and containing 140 pots. Potlines 1-4 account for 77 percent of production. As a result of these capital improvements, the plant's design production capacity was 130,000 tons annually, although in 1979 its actual production reached 134,000 tons.

The process of aluminum production begins with bauxite, which is mined and transported to a refinery, where its impurities are eliminated. This refining process results in the production of alumina, which is half aluminum and half oxygen firmly bonded together. The alumina is transported to a reduction plant, like that at Troutdale, in order to break it

---

[1] The Oregon Tax Court, 9 OTR 417 (1984), found against the taxpayer on several issues of fact, but the taxpayer has not appealed to this court, and we shall not address those issues in this opinion.

[2] ORS 305.445 provides:

"The sole and exclusive remedy for review of any decision or order of the tax court shall be by appeal to the Supreme Court. Jurisdiction hereby is vested in the Supreme Court to hear and determine all appeals from final decisions and final orders of the tax court, except with respect to the small claims division of the tax court. Such appeals, and the review of final decisions and final orders of the tax court, shall be in accordance with the procedure in equity cases on appeal from a circuit court, but without regard to the sum involved. Upon such appeal and review, the Supreme Court shall have power to affirm, modify or reverse the order or decision of the tax court appealed from, with or without remanding the case for further hearing, as justice may require."

[3] The value of the land is not an issue in this appeal.

down into its two constituents, metallic aluminum and oxygen.

At the reduction plant the alumina is placed with carbon in pots and then heated by electricity to about 1,000 degrees centigrade in order to produce molten metal. These pots are the basic units in the reduction process. They are arranged in long rows and connected together in a single electrical circuit to form a potline. As of January 1, 1980, the date of valuation, electricity for potlines 1-4 was provided by the original mercury arc rectifiers, a technology now obsolete, while the newer potline 5 was served by state-of-the-art silicon rectifiers. The pot is lined with a carbonaceous material. Inside the pot is a bath of cryolite, which serves as an electrolyte, and carbon anodes. The carbon anodes, which are consumed every ten days, are manufactured in the plant's carbon plant, pressed into blocks by two 750 ton presses, baked in furnaces for curing, and then transferred to the potrooms. When the reduction pot is in operation, electric current (65,000 amperes) passes by way of a bus, or electrical conduit, through molten cryolite, heating the bath to about 1,000 degrees centigrade. This temperature is maintained, thus allowing the bath to remain in a molten state so that alumina may be added as needed, thus making the process continuous, 24 hours a day, 365 days a year. If for any reason it is interrupted, the bath material freezes, and the pots must be emptied at considerable expense. During the process the aluminum separates from the oxygen and is deposited at the bottom and periodically syphoned off into crucibles. These crucibles transport the aluminum by cranes to the cast house for further processing. There, the molten metal is purified further, perhaps alloyed with other metals, and then poured into molds to make ingots. The ingots are then shipped to various fabricating plants.

In the past, in performing our factfinding function under ORS 305.445, we have covered many pages in discussing the evidence. *See,* for example, *Pacific Power & Light Co. v. Dept. of Rev.,* 286 Or 529, 596 P2d 912 (1979); *Bend Millwork v. Dept. of Rev.,* 285 Or 577, 592 P2d 986 (1979); and *Reynolds Metals v. Dept. of Rev., supra.* In *Bend Millwork* the opinion contains an expression of puzzlement as to the value of "sifting in writing the evidence." We stated:

"We are not required to make special findings of fact, and the detailed discussion of the evidence cannot be of any great help to the bench or bar in resolution of issues of fact in other cases involving different evidence."

285 Or at 588 n. 8. Indeed, in the process of publicly sifting the evidence, we have sometimes expressed as "holdings" what are really only "findings," and this has led to confusion as to what are rules of law laid down in our cases. *See,* for example, the discussion in *Bend Millwork* of the confusion created by our language in *Publishers Paper Co. v. Dept. of Rev.,* 270 Or 737, 530 P2d 88 (1974), where we unfortunately used the word "hold" with respect to findings of fact, thus misleading at least the Department of Revenue as to the effect to be given the decision in *Publishers.*

We have determined to forego those extensive discussions of the evidence in this kind of case. We shall discuss the evidence only in such detail as may be necessary to understand the respective positions of each party.

■ True cash value is measured by "market value" as of the assessment date. ORS 308.205. Department rules state that such value is determined by that sales price that would be reached by a willing seller and a willing buyer, where neither is under undue compulsion to bargain. *See* OAR 150-308.205-(A). Generally, there are three methods of appraisal to determine that value. One is the market approach, in which "comparable" sales are reviewed. Another is the income capitalization method, in which the income earned from the property is capitalized to determine what principal value produces that much income at a fair rate of return. The third is the cost method.

■ The parties here agreed that the first two methods were not practicable for this plant and this taxpayer. They agreed that the cost method was the only feasible method and that because there was significant functional obsolescence, the replacement, rather than reproduction, methodology should be used. In brief, the replacement method requires the appraiser to calculate the cost of replacing the subject plant with a new state-of-the-art plant. From that cost is deducted the dollar amount of physical depreciation, functional obsolescence and economic obsolescence to arrive at true cash

value. The Oregon Tax Court agreed that that was the correct methodology.

We summarize the parties' value contentions at trial and the Tax Court's decision:

|  | Taxpayer | Department | Tax Court |
|---|---|---|---|
| Replacement Cost | $225,924,000 | $218,368,000 | $218,368,000 |
| Depreciation | -126,517,440 (56%) | - 98,265,600 (45%) | -122,286,080 (56%) |
| Cost Less Depreciation | $ 99,406,560 | $120,102,400 | $ 96,081,920 |
| Functional Obsolescence | - 54,332,419 | - 37,967,800 | - 51,483,623 |
| Subtotal | $ 45,074,141 | $ 82,134,600 | $ 44,598,297 |
| Economic Obsolescence | 4,507,414 (10%) | | |
| TRUE CASH VALUE | $ 40,567,000[4] | $ 82,134,600 | $ 44,600,000 |

In its brief in this court, the taxpayer contends that the Department has not appealed from the Tax Court's decision fixing replacement cost at $218,368,000. We do not understand that to be the case. The Department has appealed from the decree of the Tax Court, and we are required to try the cause anew on the record.

The taxpayer's witnesses calculated replacement cost at just 3.5 percent more than did the Department's witness. The dollar amount is significant, however, for application of the taxpayer's percentage figure for depreciation to the higher figure for replacement cost would result in a higher figure for "Cost Less Depreciation," as the above summary demonstrates.

Both parties calculated replacement cost by first calculating the invested dollars per ton of capacity in the replacement plant. Their respective figures were close. The taxpayer's appraiser came to a figure of $1,686 per ton, while

---

As mentioned in footnote 1, *supra*, the taxpayer has not appealed from the decision of the Tax Court not to allow any sum for economic obsolescence. The case is before us for trial anew on the record, and we agree with the Tax Court; therefore, we shall not consider that factor any further.

the Department's appraiser found the figure to be $1,679 per ton. The Department's appraiser multiplied his figure by the plant's rated capacity, namely, 130,000 tons per year. The taxpayer's appraiser multiplied by 134,000 tons per year because in 1979 the plant actually produced that much.

■ The hypothetical plant is to be equivalent to the subject plant as to capacity. We do not know from the evidence that the hypothetical plant would exceed its rated capacity; therefore we believe it proper to use the design tonnage capacity.

We find that the replacement cost of the plant would be $218,368,000.

## PHYSICAL DEPRECIATION

The witnesses for the respective parties differed both in methodology and in result in calculating depreciation. The taxpayer's witnesses testified that they made a three-man team on-the-spot survey of the buildings and machinery and equipment. One member of the team was primarily responsible for inspection of the buildings; another was primarily responsible for machinery and equipment; the third was the team chief and consulted with the taxpayer's personnel concerning the operation and the necessity for maintenance and repairs to keep the plant producing and also participated with the first two in visual examinations of the components of the plant. The principal witness for the taxpayer had "overall responsiblity for the entire project."

The evidence of these witnesses is that they broke the plant down into 10 functional areas. They estimated a percent figure of depreciation for each area. They then multiplied the original life expectancy of each component by the estimated percentage of depreciation to arrive at what the principal witness called "effective age." This witness then weighted the effective age of each component by the percentage of its cost to the total replacement cost. This resulted in the witness' opinion of 56 percent depreciation.

On the other hand, the Department's witness estimated the percentage "good" of literally several hundred items. He conducted a reproduction cost study and then applied his percentage figure. By dividing the depreciated reproduction cost by the reproduction cost prior to application

of the percentage, he came to the conclusion that the subject plant was 45 percent depreciated on January 1, 1980.

As finders of fact under ORS 305.445, we perform the same function as would be performed by a jury, a trial judge, or a hearing officer. Neither party has cited to us, nor are we aware of, any rule of law that requires us to choose one or the other of the figures produced by the witnesses. The most that can be said from a matter of logic is that we have been given opinions of expert witnesses as to the maximum and minimum amounts of depreciation. A factfinder might arrive at a figure anywhere between those amounts, in part upon an evaluation of the qualifications and credibility of the opposing witnesses. The factfinder would also consider the reasons given for the opinions and the quality of the witnesses' evaluation of the predicate facts on which the opinion might rest. A factfinder is not bound by the opinion of any witness, for the weight to be given to the opinion is part of the factfinder's function.[5]

In this case the taxpayer's witnesses used a method of estimating the condition of the plant that assigned percentages to certain labels. Insofar as pertinent to their opinions in this case, those labels were:

"Good (G) - an item which may have had some repair work yet shows some effects of age or use. Minor work may still be required. (25 to 35% depreciation)

"Fair (F) - an item which is in need of general repairs and/ or replacement of parts or components due to conditions such as wear and tear, breakage and the like in order to be properly utilized. (45 to 55% depreciation)

"Poor (P) - an item incapable of being utilized without extensive repairs and/or replacement of major parts or components due to conditions such as wear and tear, breakage and the like. (65 to 75% depreciation)

"Scrap (S) - an item which is no longer serviceable and

---

[5] *Compare* UCJI No. 2.07, which provides:

"A witness who has special knowledge, skill, experience, training, or education in a particular field may give an opinion on any matter in which the witness is so skilled. In determining the weight to be given such an opinion, you should consider the qualifications and credibility of the witness and the reasons given for the opinion. You are not bound by such opinion. Give it the weight, if any, to which you deem it entitled."

which is impractical to repair or modify due to physical condition. Appraiser is to estimate the salvage value of any useable portions of the item and the scrap value of the remainder or of the entire item if no portion is of any further use."

It is noted that there is a gap of a full 10 percent between each rating. Percentages were not calculated by the three-man team on the spot but after consultation later, and the percentages were within the perimeters set by the rating range. It is obvious that any borderline judgment might carry an error of almost 10 percent.

On the other hand, the Department's witness conducted his visual inspection with another Department employee in late 1979, at a time when the witness had only two months' experience as an appraiser. He did have a degree in Engineering Physics and had experience in operating a manufacturing plant. In 1979, he had some courses offered by the Department in appraising. The other employee was a seasoned Department appraiser, who had retired by the time of the trial in the Tax Court. That employee was a witness before the Department when the Department contended for a value of $70,308,100. The witness here and the other employee went through the plant with a list of taxable properties compiled in earlier inventories for ad valorem tax purposes and visually inspected the items. Their field notes show no description of the physical condition of those various items. Approximately seven months later they jointly set their percentages from their memory of conditions observed in late 1979. The witness testified that in each instance his own opinion was the percentage on which his appraisal was based.

■ We find that both appraisals are somewhat suspect.[6] The taxpayer's principal witness and his team used a system with significant gaps in percentages. The Department's witness lacked appraisal experience and assigned percentages on the basis of memory seven months after the fact.

The taxpayer does not contend that it does not have

---

[6] There is reason to believe that the taxpayer's appraisal of physical depreciation, by a method described as ascertaining "normal" depreciation, may have included some element of functional obsolescence. The Department has made much of this in its brief and argument to this court. We think the Department blows it out of proportion. On the other hand, we find this to weaken the taypayer's opinion.

the burden of persuasion.[7] We weigh the evidence of the experts. We have very little evidence from the taxpayer as to whether any given rating of poor or fair, which are the majority of the ratings, fell in the upper or lower range of percentages. The gaps in the rating method increase our doubts as to translation of the descriptions of "fair" or "poor" to percentages.

The taxpayer's witnesses opined that many components used in their appraisal were to be rated "poor." It strikes us that in a plant dealing with the production and handling of molten metal

"an item *incapable of being utilized* without extensive repairs and/or replacement of major parts or components due to conditions such as wear and tear, breakage and the like" (emphasis added)

is not likely to have been used. We are not convinced that all of the items rated as "poor" were actually in that condition. On the other hand, there are items rated as "poor" that are not used in such manner as to be dangerous to the workers or other property of the taxpayer.

How do we come to a resolution as to the proper figure for physical depreciation? We take it for a given that the proper figure is between those proposed by the parties, because we accept neither outright. We are convinced that the taxpayer's figure is too high and that of the Department too low.

We appreciate the candor of the taxpayer's witnesses in acknowledging that the figure for depreciation is based on judgment rather than scientific means; they stated:

"Based on all pertinent data gathered in our investigation, we estimated the condition of each major component or functional area as mentioned previously. Estimating the amount of normal depreciation on an observed, or any other basis, is no easy task. There are no scientific means by which an appraiser can objectively determine the amount of expired life of any given asset. Therefore, estimates must be based on judgment after giving consideration to all available data."

---

[7] *Compare Bend Millwork v. Dept. of Rev.,* 285 Or 577, 587, 592 P2d 986 (1979).

We have compared the "estimates" of the taxpayer's witnesses and those of the Department's witnesses and the reasons given for those estimates. We are required as finders of fact under ORS 305.445 to arrive at our own estimates. We are convinced that the taxpayer's witnesses' figure for "Depreciation Observed" is too high for three of the functional areas, namely, "Pot Room Nos. 1-4," "Rectifiers 1-4" and "Carbon Plant." We have spent untold hours in trying to compare the opposing parties' evidence, *i.e.*, estimates on the major functional area that the taxpayer's witnesses describe as "Other," apparently meaning all areas not embraced in any of the first nine major functional areas identified by those witnesses. Because the Department's witness did not separate out areas in that same manner, our effort to compare and weigh the evidence has not been as fruitful as we might desire; nevertheless, we are convinced that the figure for "Depreciation Observed" for "Other" is too high.

We have reduced the "Depreciation Observed" figure used by the taxpayer's witnesses in those four major functional areas to .600, .650, .60 and .500, respectively. We have accepted the taxpayer's figures for the other six functional areas and then applied the taxpayer's methodology to arrive at weighted depreciation. The result is to arrive at a figure of .4986 for physical depreciation.

## FUNCTIONAL OBSOLESCENCE

The Tax Court found, and we agree:

> "In order to measure functional obsolescence, both parties estimated excess operating costs incurred because of operating inefficiencies. The parties agreed that there was functional obsolescence in six categories: (1) power consumption, (2) maintenance materials, (3) pot relining costs, (4) labor costs, (5) carbon consumption, and (6) gas consumption."

The parties were relatively close in their dollar figures of annual excess operating costs due to functional obsolescence. Taxpayer: $22,850,350; Department: $21,652,244. The differences are mainly due to the taxpayer calculating its figure on the basis of production of 134,000 tons annually, and the Department's use of the rated capacity of 130,000 tons. As did the Tax Court, we find that the proper figure is that proposed by the Department.

Where the parties disagree quite strongly is in how to translate this excess operating cost into a reduction in market value of the plant.

Both parties are agreed that in arriving at market value a willing buyer and seller would consider the amount of excess operating costs in determining the cash purchase price. As we understand it, the parties to the sale would consider the length of time over which the excess operating costs would have to be paid out by the owner of the plant, the cost of capital and the appropriate way in which to treat compounding, for, of course, the money is not paid out all at once but rather over the period in which the plant would be expected to operate and produce income.

It is the present value of that negative flow of income that the buyer would consider in fixing the price he would be willing to pay; likewise the seller would have to consider the present value of that negative flow in fixing his selling price. That is the area of disagreement.

The length of time over which capitalization should be computed was addressed. The Department's witness estimated 10 years, although the taxpayer was assured by its contracts with Bonneville Power Administration of absolutely necessary power only until the end of 1986, a period of seven years. We find that a willing buyer would not have been willing to consider that the buyer would have the necessary power to operate the plant beyond the end of 1986.

A well qualified witness for the taxpayer testified that the cost of capital would be 12.6 percent. He testified as to how he reached this figure by two different methods. He made a study of three other similar aluminum companies, analyzing their capital structures as to debt and equity, and developed an average. He then analyzed the taxpayer's capital structure and developed a slightly lower figure that would have been advantageous to the taxpayer if used in this case. The higher figure was 12.6 percent.

On the other hand, the Department's witness found the cost of capital in 1980 to be eight percent. We are not convinced. The Department's witness then raised that figure to 18 percent each year to recover the investor's capital (over the 10-year period of plant life for which he had argued). We

confess that we do not understand that proposition. There is no capital to recover in this respect. The buyer (investor) has reduced the price he will pay by the present value of the negative income flow. He has not paid out that amount to anyone. There is nothing to capture.

We find the figure of 12.6 percent to be the proper figure to use for the capitalization rate.

Were it not for the excess operating expenses, the owner of the plant would have additional annual income of $21,652,244. This would be subject to tax measured by income. The Department contended that the taxpayer's own records showed that its effective rate of taxation was 36.75 percent. The statutory rate was 50 percent. The Tax Court found, and we agree, that a prospective willing buyer would realistically have had to view the statutory rate when determining what amount of income after tax would actually be lost each year to the excess operating costs caused by functional obsolescence. The annual loss would be $10,826,122.

One final area of disagreement remains. The taxpayer's witnesses contended that capitalization of the negative income should be calculated using a method called "continuous compounding," while the Department, if we understand its position, contended that annual compounding was appropriate. The taxpayer's witness implicitly concedes that the continuous compounding tables that he used are not yet widely used in this field, as distinguished from the banking field. By using continuous compounding, the taxpayer arrived at the present value factor of 4.7555. Multiplying that factor by the annual net operating cost loss of $10,826,122 equals $51,483,623, found by the Tax Court to be proper.

We accept the taxpayer's evidence and contention that prudent investors are no longer satified with annual compounding. We are convinced that the willing buyer of a plant of this kind would be as sophisticated as was the taxpayer's witness. We accept the taxpayer's position.

We have found that the figure to be capitalized is $10,826,122. The rate should be 12.6 percent. The time should be a period of seven years. The proper value factor is 4.7555. Using that factor produces a value for functional obsolescence of $51,483,623.

We recapitulate our findings:

| | |
|---|---|
| Replacement cost new | $218,368,000 |
| Physical depreciation | -108,878,280 |
| Cost less depreciation | $109,489,720 |
| Functional obsolescence | -51,483,623 |
| True cash value | $ 58,006,097 |

## POLLUTION CONTROL EXEMPTION

The legislature has chosen to encourage pollution control by means of the tax laws. A taxpayer such as this one may, by investing in pollution control equipment, reap certain tax benefits. In this instance, the benefits, at the option of the taxpayer, could be realized either by way of a corporate excise tax exemption or an ad valorem exemption. ORS 307.405 as of January 1, 1980, provided that pollution control facilities meeting the requirements of ORS 468.165, if certified by the Environmental Quality Commission pursuant to ORS 468.170, were exempt from ad valorem taxation if, as did this taxpayer, election were made on that basis.

Before the Department of Revenue, the taxpayer contended that the Environmental Quality Commission had certified the sum of $28,009,900 as the proper amount for exemption. The taxpayer contended that this should be deducted, not from true cash value, but from the assessed value of its property, which in Multnomah County was 87.6 percent of true cash value. Both the Department and the Tax Court rejected that contention, and the Tax Court decreed that the sum was to be deducted from true cash value. The taxpayer has not appealed from that decision.

The Department contends that it has appealed from that decision and that its position in the Tax Court was that the amount of the exemption should be the true cash value of the pollution control facilities, not the amount certified by the Environmental Quality Commission. We assume, *arguendo,* that the matter is properly before us. We hold that ORS 307.405 exempts these facilities to the figure certified by the Environmental Quality Commission, namely $28,009,900.

We modify the decree of the Oregon Tax Court to hold that the true cash value of the plant, as herein described, is the sum of $58,006,097, and that $28,009,900 of that amount is exempt. The matter is remanded to the officers having

charge of the Multnomah County assessment and tax rolls for 1980 to correct the figure for true cash value of the plant and to allow an exemption as herein determined. If taxes have been paid in excess of those due and owing under this modification, they shall be refunded with interest at the statutory rate. Neither party shall have costs in this court.