Argued and submitted September 9, 1996, judgment of Tax Court modified and case remanded to Tax Court for further proceedings June 11, 1999

## DELTA AIR LINES, INC.,
*Appellant,*

*v.*

## DEPARTMENT OF REVENUE,
State of Oregon,
*Respondent.*

(OTC 3278; SC S42866)

984 P2d 836

James W. McBride, of Baker, Donelson, Bearman & Caldwell, Washington, D.C., argued the cause for appellant. With him on the briefs were Gregory G. Miner and Bruce Cahn, Portland, and Stephen D. Goodwin, of Baker, Donelson, Bearman & Caldwell, Memphis, Tennessee.

Joseph A. Laronge, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief was Theodore R. Kulongoski, Attorney General, Salem.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, and Durham, Justices.**

CARSON, C. J.

---

** Fadeley, J., retired January 31, 1998, and did not participate in this decision; Graber, J., resigned March 31, 1998, and did not participate in this decision.

## CARSON, C. J.

This *ad valorem* tax case involves two claims filed by Delta Air Lines, Inc. (Delta) against the Department of Revenue (the department). Among other things, Delta requested a set-aside of the department's assessment of its taxable property and a determination of the value of that property. The Tax Court entered a single judgment that denied both claims. *Delta Air Lines, Inc. v. Dept. of Rev. (II)*, 13 OTR 372 (1995).

Delta's first claim alleges discrimination in taxation under 49 USC section 40116(2)(A), formerly codified as 49 USC section 1513(d). That claim is identical to claims raised by other airlines in *Northwest Airlines, Inc. v. Dept. of Rev.*, 325 Or 530, 943 P2d 175 (1997), which this court rejected. Delta has agreed that the holding in that case controls its federal discrimination claim. Accordingly, we reject Delta's claim under 49 USC section 40116(2)(A) without further discussion.

Delta's second claim challenges the department's valuation of its air transportation property, particularly its leased aircraft, located in Oregon during the 1992-93 tax year. For the reasons that follow, we reject most of Delta's contentions challenging the valuation of its owned and leased taxable property. However, we agree with Delta that the department made some errors in appraising Delta's property. Accordingly, we modify the judgment of the Tax Court.

## I. FACTS AND PROCEDURAL BACKGROUND

We limit our factual discussion to Delta's valuation claim. Delta is an interstate air carrier that owns property located in Oregon. As of July 1, 1992, the assessment date at issue in this case, Delta served 163 domestic cities in 45 states, the District of Columbia, and United States possessions, and provided air transportation service to 33 foreign countries. It also operated six domestic and two international "hub" airports within the United States, as well as a European hub in Germany. One of the international hub airports within the United States was located in Portland. That facility served both international and domestic flights, and also served as a maintenance facility.

Delta's air transportation property located in Oregon was subject to *ad valorem* taxation under ORS 308.515.[1] In addition to owning property, Delta leased a significant number of aircraft—almost half its fleet. Those leased aircraft also were subject to taxation, assessable to Delta under ORS 308.510(1).[2] The department assessed Delta's taxable property using the unit method allowed under ORS 308.555 (1993),[3] by valuing the property owned and leased by Delta system-wide and then determining the proportion of that value of taxable property attributable to Oregon. The department initially determined that the system-wide value of Delta's owned and leased property was $10,257,000,000, and that the value allocable to Oregon was $63,029,000. Delta challenged that Oregon valuation by filing a complaint in the Tax Court.

[1] ORS 308.515 provides, in part:

"(1) The Department of Revenue shall make an annual assessment, upon an assessment roll to be prepared by the division of the department charged with property tax administration, of the following property having a situs in this state:

"(a) [With exceptions that do not apply here], any property used or held for its own future use by any company in performing or maintaining any of the following businesses or services or in selling any of the following commodities, whether in domestic or interstate commerce or both, and whether mutually, or for hire, sale or consumption by other persons: * * * air transportation * * *."

[2] For purposes of taxation, ORS 308.510(1) defines "property" as:

"[A]ll property, real and personal, tangible and intangible, *used or held by a company as* owner, occupant, *lessee,* or otherwise, *for or in use in the performance or maintenance of a business or service* or in a sale of any commodity, * * * but does not include [assets that are not at issue here]." (Emphasis added.)

The property at issue here is aircraft held by Delta under operating leases, which are leases in the more traditional sense of that term. Both Delta and the department treat aircraft held by Delta under capital leases—which, by their nature, are more akin to ownership of property—as if Delta had owned those aircraft.

[3] ORS 308.555 (1993) provided, in part:

"The department, for the purpose of arriving at the real market value of the property assessable by it, may value the entire property, both within and without the State of Oregon, as a unit. If it values the entire property as a unit, either within or without the State of Oregon, or both, the department shall make deductions of the property of the company situated outside the state, and not connected directly with the business thereof, as may be just, to the end that the fair proportion of the property of the company in this state may be ascertained. If the department values the entire property within the State of Oregon as a unit, it shall make deductions of the property of the company situated in Oregon, and assessed by the county assessors, to an amount that shall be just. * * *"

At trial, Delta presented an appraisal by an outside appraiser that concluded that the system-wide value of Delta's property did not exceed $5.4 billion and, using the department's formula, the value allocable to Oregon was $32,152,900 (as corrected during trial). The department abandoned its original appraisal and presented a new appraisal ("the department's trial appraisal" or "the department's appraisal") that concluded that Delta's system-wide property value was $10,810,000,000, and its Oregon value was $69,961,000.

In reaching their valuation figures, the appraisers for Delta and the department both utilized three approaches to value, or "value indicators"—the income approach, the cost approach, and a market-based "stock and debt" approach. In following those approaches, however, the two appraisers utilized different procedures, the most significant of which concerned treatment of Delta's leased aircraft. In general, Delta's appraiser did not include lease payments—which the department asserts represented the lessors' ownership interest in Delta's leased aircraft—as part of the unit value in the income and the stock and debt indicators of value, reasoning that the value of leased aircraft already was reflected in those indicators. In contrast, the department's appraiser made significant adjustments for leased aircraft, adding a separate value for lease payments to the system-wide unit value for Delta's owned property in both the income and the stock and debt indicators, resulting in higher unit values.

The Tax Court concluded that Delta's approaches to value were erroneous, because they focused upon the value of Delta itself, rather than the value of Delta's taxable property. 13 OTR at 376. The Tax Court further concluded that the department's system-wide valuation figure of $10,810,000,000 was correct and, accordingly, entered judgment for the department. *Id.* at 383.

## II. STANDARD OF REVIEW

We first address an issue concerning the proper standard of review. When this case was briefed and argued in this court, review of appeals from the Tax Court was *de novo* on the record made in the Tax Court. *See* ORS 305.445 (1995) (review of Tax Court appeals "shall be in accordance with the

procedure in equity cases on appeal from a circuit court"); *former* ORS 19.125(3) (1995), *renumbered as* ORS 19.415(3) (1997) (in appeals in equity cases, the Court of Appeals "shall try the cause anew upon the record"). However, the 1995 Legislature amended ORS 305.445 to provide, in part:

> "The scope of the review of either a decision or order of the tax court judge shall be limited to errors or questions of law or lack of substantial evidence in the record to support the tax court's decision or order." Or Laws 1995, ch 650, § 25.

The 1995 Legislature further provided that the changes to the tax laws set out in chapter 650 would "become[ ] operative on September 1, 1997." Or Laws 1995, ch 650, § 116(1).

■ We must determine whether the legislature intended the new standard of review—errors of law or substantial evidence—to apply retroactively to cases that were commenced in this court before September 1, 1997, the operative date of the 1995 amendment, and that still were pending on that date. To answer that question, we first examine the text and context of the 1995 amendment to ORS 305.445. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993) (setting out methodology); *Owens v. Maass*, 323 Or 430, 433, 918 P2d 808 (1996) (applying *PGE* when determining whether an amended statutory time limitation should apply retroactively). Context includes all provisions of Oregon Laws 1995, chapter 650, including the operative date set out in section 116(1). *See Owens*, 323 Or at 434 & n 5 (context includes all parts of law as enacted and contained in session laws).

As noted, the new standard of review provision originally was set out in section 25 of Oregon Laws 1995, chapter 650, which provides:

> "ORS 305.445 is amended to read:
>
> "305.445. The sole and exclusive remedy for review of any decision or order of the **judge of the** tax court shall be by appeal to the Supreme Court. Jurisdiction hereby is vested in the Supreme Court to hear and determine all appeals from final decisions and final orders of the **judge of the** tax court[, *except with respect to the small claims division of the tax court*]. **The scope of the review of either a**

**decision or order of the tax court judge shall be limited to errors or questions of law or lack of substantial evidence in the record to support the tax court's decision or order.** Such appeals, and the review of final decisions and final orders of the tax court, shall be in accordance with the procedure in [*equity cases*] **actions at law** on appeal from a circuit court, but without regard to the sum involved. Upon such appeal and review, the Supreme Court shall have power to affirm, modify or reverse the order or decision of the tax court appealed from, with or without remanding the case for further hearing, as justice may require." Or Laws 1995, ch 650, § 25 (new text in boldface; deleted text in brackets and italics).

In order to understand the changes made to ORS 305.445, it is important to note that, in enacting chapter 650, the 1995 Legislature reorganized the tax appeals process, by replacing the departmental hearings process with a new process established in the magistrate division of the Tax Court. *See generally* Or Laws 1995, ch 650, § 2 (establishing magistrate division).

Turning, then, to section 25, we first observe that the text does not indicate whether the new standard of review applies to cases commenced in this court before September 1, 1997. Other aspects of section 25, however, suggest that the new standard applies only to cases filed in the Tax Court on or after September 1, 1997. For example, by adding the words "judge of the" before "tax court" in two other sentences, the legislature clarified that, as of September 1, 1997, the Tax Court included the magistrate division, staffed with magistrates, as well as the regular division, staffed with a judge. *See* Or Laws 1995, ch 650, § 104 (so providing). It is plausible, therefore, that the new standard of review provision, which similarly refers to the "tax court judge," applies only to cases appealed from the Tax Court after the new magistrate and regular divisions began operation.

The context of section 25 supports that reading. With one minor exception,[4] all the amendments, new statutory provisions, and repeal provisions set out in chapter 650

---

[4] Section 6a of Oregon Laws 1995, chapter 650, defined the term "frivolous position" in the context of tax cases.

relate to the creation of the new magistrate division and certain processes related to that division, and the adaptation of existing tax statutes to the new appeals process. It therefore is logical to conclude that the legislature intended the new standard of review to be a part of that new process. We have found nothing in the text or context of Oregon Laws 1995, chapter 650, that points to a contrary reading of the standard of review provision in section 25.

We conclude that the new standard of review was intended to apply only to cases filed in or transferred to the Tax Court on or after September 1, 1997. It follows that the new standard of review does not apply retroactively to this case. Accordingly, we proceed to review this case *de novo* under ORS 305.445 (1995). Delta must prove its claims by a preponderance of the evidence. ORS 305.427.

## III. LEASED-EQUIPMENT ADJUSTMENT

### A. *Approaches to Value and Final Appraisal Calculations*

The central dispute between the parties is whether the unit valuation of Delta's taxable property should have included a so-called "leased-equipment adjustment," that is, an adjustment for aircraft leased, rather than owned, by Delta. Stated differently, in determining a value for Delta's taxable property, the issue is whether it was permissible for the department to include in that value a separate calculation of the value of aircraft that Delta leases. In order to understand the parties' contentions concerning the leased-equipment adjustment, it first is necessary to explain the three approaches to value and how the parties' appraisers applied them in this case.

### 1. *Income approach*

The income approach to value focuses upon investor anticipation of future benefits to be derived from property owned and used by a company. Generally speaking, the income approach measures the present value of the anticipated future stream of income attributable to the company's operating property, by discounting the company's anticipated cash flows to present value using a capitalization rate that reflects the company's costs of investment.

Delta's appraiser followed a "perpetuity" model in his income approach, which assumed that Delta would continue operation into the indefinite future. He first estimated a perpetual, annual revenue figure of $11.5 billion. He then applied an estimated operating margin of 7.5 percent to that figure, resulting in an estimated, annual net operating income of $862.5 million. The effect of that calculation was to remove lease payments to Delta's lessors from the income stream subject to capitalization. Next, Delta's appraiser deducted estimated taxes from net operating income, resulting in $552 million to be capitalized into present value. Applying a capitalization rate of 12 percent, he then determined that the present value of Delta's estimated, annual cash flow, derived from its system-wide operating property, both owned and leased, totaled $4.6 billion.

The department's appraiser, in contrast, followed a "limited-life" model in his income approach. That model sought to determine the income that reasonably could have been expected to be generated from the group of assets subject to valuation, for the average anticipated life of those assets. The department's appraiser first concluded that the average, annual income projection from Delta's owned assets was $250 million. He then added in noncash expenses, such as depreciation, for a total, annual income figure to be capitalized of $806,634,000, based upon an average asset life of 13 years. Applying a capitalization rate of 12.3 percent, the department's appraiser next calculated a net present-value figure of $5,428,736,000, which included a separate, residual-value calculation of $322,295,000, representing the value of Delta's owned assets at the end of their useful lives. He then calculated the present value of the average, annual lease payments on all Delta's leased aircraft, using a capitalization rate that reflected the airline industry's cost of debt, plus the residual value of the leased aircraft to the lessors at the end of the lease terms, which together totaled $5,778,594,000. Finally, the department's appraiser added the two present-value figures (income, including residual values of owned property, plus lease payments, including residual values of leased property), for a total valuation figure of $11,207,330,000 for Delta's operating unit.

## 2. Cost approach

■ The cost approach to value is based upon the principle of substitution, that is, it assumes that property is worth its cost or the cost of a satisfactory substitute with equal utility. Thus, the cost approach seeks to determine the cost of the unit that is being valued.

In his cost approach, Delta's appraiser first determined the original, or historical, cost of Delta's owned assets, by examining Delta's books. He then deducted accrued depreciation, also obtained from the books, leaving a total of $5,880,394,000. Delta's appraiser next determined the cost of Delta's leased aircraft and deducted accrued book depreciation for those aircraft, for a total of $4,792,698,000. He then added those two figures (for owned property and for leased property), for a total of $10,673,092,000. Next, he calculated an obsolescence factor of 56.7 percent, which purportedly represented the difference between the market value and the cost of Delta's taxable property due to functional and economic obsolescence.[5] In calculating his obsolescence factor, Delta's appraiser followed the "income-deficiency" method, which relied to a significant degree upon his earlier results in his income approach to value.[6] Finally, he applied that factor to his total cost figure, less depreciation, for a total cost value of $4,621,449,000.

The department's appraiser used different approaches to determine cost, depending upon the type of asset being valued. For airport terminal property and certain

---

[5] "Functional obsolescence" represents a decline in value due to factors internal to the property, such as technological inefficiencies; "economic obsolescence" represents a decline in value due to factors external to the property, such as economic conditions and government regulations.

[6] The "income-deficiency" method compares market value and cost, and deems the difference between the two to be obsolescence. Using that method, Delta's appraiser first determined the actual rate of return on the property being valued by dividing net operating income, as determined in his income approach ($552,000,000), by the total cost of owned and leased property less depreciation, as determined in his cost approach ($10,673,092,000). That calculation resulted in an actual rate of return of 5.2 percent. Next, Delta's appraiser divided that actual rate of return by a capitalization rate of 12 percent, reaching a figure of 43.3 percent. He then subtracted the 43.3 percent figure from 100 percent, resulting in an obsolescence factor of 56.7 percent.

equipment, he followed an approach similar to Delta's appraiser, using Delta's books to determine historical costs and depreciation. In contrast, for both owned and leased aircraft, the department's appraiser began with historical costs, but then applied his own depreciation scheme, based upon his analysis of market transactions as reported in a 1991 publication by Avmark, Inc., an aviation marketing and management organization. The department's appraiser concluded that, under the cost approach, Delta's owned and leased property had a value of $11,750,000,000 (as corrected during trial). He did not make a separate adjustment for obsolescence because, in his view, his market depreciation analysis accounted for any obsolescence that might have existed.

### 3. *Stock and debt approach*

■ The stock and debt approach to value, which is a substitute for a market-sales approach, is based upon the premise that the value of assets is equal to total liabilities plus equity. Thus, the stock and debt approach assumes that the market value of a company's assets can be imputed from the market value of its equity and debt.

In his stock and debt approach, Delta's appraiser calculated a gross stock and debt value of $9,845,817,000, which included Delta's stock, long-term debt, capital-lease obligations (but not operating-lease obligations), and current liabilities. His stock calculation included $1 billion of preferred stock issued on July 1, 1992, the assessment date at issue in this case. Delta's appraiser then deducted the value of nontaxable assets from that figure, resulting in a system-wide stock and debt value of $6,786,155,000. Delta's appraiser did not make a leased-equipment adjustment because, in his view, the value of Delta's leased aircraft was reflected in the value of its securities, particularly in the current market value of its stock. He also did not include the value of Delta's deferred credits, comprised primarily of deferred income taxes and deferred gains on certain sale and lease-back transactions, in his debt calculation.

Like Delta's appraiser, the department's appraiser determined a value for all Delta's stock and debt. However,

he utilized stock prices and long-term debt figures that differed from those used by Delta's appraiser. He also did not include the July 1, 1992, $1 billion preferred-stock issuance in his stock calculation. Additionally, unlike Delta's appraiser, the department's appraiser included the value of deferred credits in his debt calculation because, in his view, such credits represented potential claims against Delta's assets. After calculating a preliminary stock and debt total, the department's appraiser made adjustments for nontaxable property, resulting in a total of $6,774,133,000. Finally, he added $5,259,994,000, which represented the present value of Delta's lease payments,[7] to that figure, reaching a final stock and debt value of $12,034,127,000.

### 4. *Final valuation calculations*

After completing the three approaches to value, both appraisers then used their results under those approaches to calculate a system-wide value for Delta's taxable property. Delta's appraiser gave substantial weight to the income approach, some weight to the stock and debt approach, and limited weight to the cost approach, calculating a total system-wide value of $5.4 billion. In contrast, the department's appraiser gave substantial weight to both the cost and the stock and debt approaches, but only limited weight to the income approach, calculating a total system-wide value of approximately $10.8 billion. In order to determine the Oregon value of Delta's property subject to taxation, both appraisers then applied an allocation factor of 0.6472 percent to their system-wide figures and also made an additional real

---

[7] In his income approach, in addition to calculating the present-value figure of $5,259,994,000 for Delta's lease payments, the department's appraiser also calculated the present value of the residual value remaining at the end of each lease term and added that residual figure to the lease-payment figure, reaching a total leased-equipment adjustment of $5,778,594,000. *See* 328 Or at 604 (explaining the department's leased-equipment adjustment in its income approach). According to the record, the income approach included a residual-value calculation on the leased aircraft because the purpose of the income approach was to measure the projected stream of income to be derived from Delta's assets, including its leased aircraft.

In contrast, the "debt" component of the stock and debt approach measured the level of Delta's obligations, which, in the department's appraisal, included the present value of the lease payments. Accordingly, the department's stock and debt approach did not incorporate residual values. Rather, the department's appraiser included only the $5,259,994,000 lease-payment figure in his leased-equipment adjustment in the stock and debt approach.

market value adjustment of eight percent. Delta's appraiser concluded that the final Oregon value of Delta's taxable property was $32,152,900; the department's appraiser concluded that the final Oregon value was $69,961,000.

B. *Appropriateness of Leased-Equipment Adjustment*

As can be seen, in the income and the stock and debt approaches to value, Delta's appraiser did not make a separate adjustment for aircraft leased by Delta. In addition, although his cost approach included the cost of leased aircraft, Delta's appraiser relied upon figures calculated in his income approach, which did not adjust for leased aircraft, to calculate obsolescence. In contrast, the department's appraiser made a separate adjustment for leased aircraft in both the income and the stock and debt approaches, and included the cost of leased aircraft, without relying upon figures from the income approach, in the cost approach.

Delta argues that, because the concept of unit valuation seeks to value an integrated set of assets as a single operating unit, it was inappropriate for the department to make a separate adjustment for leased equipment. In Delta's view, such an adjustment effectively combined the unit concept with the summation concept, which values individual assets separately and then adds those values to calculate a final valuation figure. Delta further argues that making a separate adjustment for leased equipment, as the department did, resulted in a "double-counting" of that equipment. Specifically, in the income approach, Delta reasons that its final valuation figure, as calculated by its appraiser, represented all the income generated by all Delta's owned *and* leased aircraft, and, therefore, the value of its leased aircraft was captured in that final valuation figure. In the stock and debt approach, Delta similarly reasons that the value of leased aircraft already was reflected in the value of its stock and other securities, and, therefore, the department's leased-equipment adjustment double-counted that value.

The department responds that it did not violate the unit concept when it calculated a separate value for Delta's leased aircraft and included that value in the income and in the stock and debt approaches. The department asserts that the purpose of a unit valuation is to capture the incremental

increase in value that derives from the operation of several assets as a unit. It follows, in the department's view, that Delta's income and its stock and debt approaches valued only Delta's owned property and the incremental benefit derived from Delta's owned and leased property operating as a unit. The department continues, however, that Delta's income and its stock and debt approaches did not capture the value of Delta's leased aircraft, represented by lease payments to the lessors. In the department's view, a leased-equipment adjustment is required in order to capture the lessors' ownership interest in the leased aircraft.

■ Before this court and the Tax Court, both parties focused their arguments upon the theoretical propriety of making a leased-equipment adjustment when appraising Delta's taxable property. We need not engage in that debate, however, because an administrative rule answers the question whether such an adjustment is permissible. OAR 150-308.205-(B) provides, in part:

> "The Western States Association of Tax Administrators (WSATA) 1989 Handbook on 'Valuation of Utility and Railroad Property,' is adopted as the official valuation guide for property assessed by the Oregon Department of Revenue under ORS 308.505 to 308.660 and 308.705 to 308.730 for ad valorem taxes.

> "* * * * *

> "(7) PROCEDURE FOR VALUATION OF AIR TRANSPORTATION AND AIR EXPRESS COMPANIES.

> "(a) The property of air transportation companies shall be valued using one or more of the following appraisal approaches:

> "(A) A cost indicator utilizing either reproduction, replacement, or historical cost data[,] which ever is most appropriate depending on degree of regulation and availability of data. * * *

> "(B) Income capitalization methods as described in the WSATA 'Handbook on Valuation of Utility and Railroad Property.' * * *

"(C) The stock and debt indicator as described in the WSATA 'Handbook on Valuation of Utility and Railroad Property.'

"(D) The market data approach.

"(b) *The reconciled unit value estimate shall be adjusted to include taxable property not included in the unit, i.e., full value of lessors' interest* in equipment leased from others or to exclude nontaxable property included in the unit.

"\* \* \* \* \*

"(11) EFFECTIVE DATE:

"This rule first applies to property valuation as of January 1, 1990." (Emphasis added.)

Thus, OAR 150-308.205-(B)(7)(b) specifically requires that, in valuing an air-transportation company such as Delta, the department make an adjustment for leased equipment to value fully the lessors' interest, *i.e.*, the ownership interest in the leased aircraft. In light of that express requirement, Delta cannot argue persuasively that the Tax Court erred in approving the department's decision to make leased-equipment adjustments in its approaches to value.[8] We hold that, as a general matter, it was permissible—indeed, required—for the department to make a separate adjustment for Delta's leased equipment in its appraisal.

Delta raises additional issues that concern the manner in which the department adjusted for Delta's leased aircraft, which we address below. Before doing so, we note that OAR 150-308.205-(B) adopts the Western States Association of Tax Administrators Appraisal Handbook on "Valuation of Utility and Railroad Property" (1989) (WSATA Handbook) as the official valuation guide for assessing property under ORS 308.510(1), ORS 308.515, and ORS 308.555. Further, OAR 150-308.205-(B)(7)(a)(B) and (C) specifically require the

---

[8] Delta does not challenge the validity of the administrative rule; rather, it challenges the department's decision to make a leased-equipment adjustment, as well as its manner of doing so.

department to refer to the WSATA Handbook when completing the income and the stock and debt approaches in the valuation of an air transportation company. The WSATA Handbook, therefore, is pivotal to our determination of several of Delta's challenges.

C. *Specific Challenges to the Department's Manner of Adjusting for Leased Equipment*

 1. *Type of leased-equipment adjustment*

■ Delta first contends that, even if a leased-equipment adjustment were required, the department should have employed the traditional method of adjusting for such equipment. According to the record, the traditional method treats leased property as if it were owned by the lessee. Under that method, in the income approach, lease expenses are not deducted when determining net operating income; however, deductions are taken from that income figure for the depreciation and taxes that would result if the leased property actually were owned by the lessee. In contrast to that method, in his income approach, the department's appraiser calculated a *separate* present-value figure for Delta's lease payments, including the residual values remaining at the end of the lease terms, and added that figure to its present-value figure for the cash flows generated from Delta's owned property operating as a unit. Similarly, in his stock and debt approach, the department's appraiser added a separate present-value figure for Delta's lease payments (but not the residual values). Delta contends that there is no support for the department's method of adjusting for leased property, emphasizing that the department's own expert witness on unitary appraisal, as well as its own supporting documentation, advocated only the traditional method of adjusting for leased equipment.

 The WSATA Handbook is helpful in answering the question before us. In discussing the income approach, the handbook first explains that the traditional approach—treating leased property as if it were owned—is a straightforward method for capturing the value of noncapitalized leased assets. WSATA Handbook at 71. However, the handbook then notes that, if the cost of capital for leased assets is different from the cost for owned assets, then the traditional

approach can result in significant value distortions. *Ibid.* In such a circumstance, the handbook suggests the alternative approach of capitalizing the lease payments and adding that amount to the capitalized income figure for owned property. *Ibid.* Further, the WSATA Handbook also specifically approves of the same method of adjusting for leased equipment in the stock and debt approach, which the department's appraiser followed in this case. *See* WSATA Handbook at 97 (requiring leased-equipment adjustment in the stock and debt approach, which may be made "by adding to the stock and debt valuation the present value of the remaining annual lease payments for a long term lease").

The department's appraisal noted that the traditional method for valuing leased equipment improperly would skew the income approach results in this case, due to certain cost differences between owned and leased assets. Consequently, the department's appraiser followed the second approach approved in the WSATA Handbook. In light of the directive in OAR 150-308.205-(B)(7)(a)(B) and (B)(7)(b), it was not error for the Tax Court to approve that manner of adjusting for Delta's leased aircraft in the income approach. Further, in light of OAR 150-308.205-(B)(7)(a)(C) and (B)(7)(b), we also approve of the department's manner of adjusting for Delta's leased aircraft in the stock and debt approach. However, as explained below, we hold that the amount of the leased-equipment adjustment must be modified in both the income and the stock and debt approaches.

2. *Amount of leased-equipment adjustment*

■ Delta next contends that, even if we agree with the department's manner of adjusting for leased equipment, the department's appraiser calculated an excessive value for Delta's leased aircraft both in his income and in his stock and debt approaches to value. Delta first argues that the department's appraiser erred in capitalizing Delta's gross lease-payment figures, rather than allowing for operating expenses, including depreciation and taxes. Second, Delta argues that the department's appraiser improperly capitalized Delta's lease payments by using a capitalization rate

that represented the industry's cost of debt, rather than Delta's weighted average cost of capital.

At trial, the department's appraiser conceded that an adjustment similar to the one now advocated by Delta would be reasonable in the income approach. He presented an alternative calculation at trial of the value of Delta's leased aircraft that focused upon the cash flow to the lessors in the form of lease payments. Rather than capitalizing the gross lease payments at the industry's cost of debt, the appraiser's alternative calculation deducted the lessors' estimated taxes and depreciation from Delta's gross lease payments and then calculated the present value of the lease payments and residual values, using a capitalization rate that represented the lessors' weighted average cost of capital. That alternative calculation reached a present-value figure for Delta's lease payments of $4,448,460,053 and a residual-value figure on the leases of $644,257,966, for a total present-value figure in the income approach for Delta's leased aircraft of $5,092,718,019. That final leased-aircraft figure was almost $686 million less than the total reflected in the department's trial appraisal. The department's appraiser expressed confidence in his alternative calculation, testifying that, if the court concluded that that type of calculation were necessary in order to value the lessors' interest, then the new figure of almost $5.1 billion would be a reasonable estimation of the present value of Delta's leased aircraft.

On rebuttal, Delta's appraiser criticized the department's alternative calculation, reiterating his earlier contention—which we already have rejected—that it was erroneous for the department to include a separate leased-equipment adjustment of any kind. Nonetheless, as noted above, Delta now asks this court to approve a calculation of value that adjusts for certain expenses related to Delta's leased aircraft, such as depreciation and taxes. That proposed adjustment theoretically is similar to the alternative calculation that the department's appraiser presented at trial. The parties continue to dispute, however, the type of capitalization rate that should have been used in calculating the present value of Delta's lease payments, with Delta contending that that rate must represent Delta's weighted average cost of capital,

rather than either the industry's cost of debt (as used in the department's appraisal) or the lessors' weighted average cost of capital (as used in the department's alternative trial calculation).

After considering the parties' arguments and reviewing the record, we conclude that the alternative calculation presented at trial by the department's appraiser, which incorporated the lessors' weighted average cost of capital,[9] represents the most reasonable calculation of the present value of Delta's lease payments in this record. *See generally Reynolds Metals Co. v. Dept. of Rev.*, 299 Or 592, 602-03, 705 P2d 712 (1985) (demonstrating that Supreme Court must determine appropriate figures in valuation cases on *de novo* review, based upon available evidence in the record, even where such evidence is less than ideal). Accordingly, we make the following modifications to the figures contained in the department's trial appraisal. First, as to the department's income approach, we reduce the present value of the lease payments, which included the residual values of the leased aircraft, from $5,778,594,000 to $5,092,718,019. That new, modified figure incorporates a present-value figure for the lease payments of $4,448,460,053 and a residual-value figure of $644,257,966. Using that modified figure, we calculate a new, system-wide value figure under the income approach of $10,521,454,019. Second, as to the department's stock and debt approach, we reduce the present value of the lease payments from $5,259,994,000 to $4,448,460,053, for a new, system-wide value figure of $11,222,593,053.[10]

## IV. OTHER VALUATION ISSUES

### A. *Income Approach*

#### 1. *Limited-life and perpetuity models*

■ Delta next contends that the Tax Court should not have used the department's income approach, because it

---

[9] Delta has not proved by a preponderance of the evidence either that the capitalization rate must have incorporated Delta's weighted average cost of capital or that it was improper for the department's appraiser to use the lessors' weighted average cost of capital in his alternative calculation.

[10] As noted earlier, the department's stock and debt approach did not include an amount representing the residual value remaining at the end of each lease term. *See* 328 Or at 607 & n 7 (so explaining). Therefore, we also do not include a residual-value figure when calculating the appropriate leased-equipment adjustment in the stock and debt approach.

improperly utilized a limited-life model. As noted above, the department's limited-life model forecasted the income expected to be derived from the subject unit of assets over the remaining economic life of those assets. Using that model, the department's appraiser concluded that, before accounting for residual value in the assets, Delta's projected, annual income to be capitalized totaled approximately $806.6 million. In contrast, Delta's appraiser followed a perpetuity model in his income approach, which forecasted the income to be capitalized into perpetuity. Delta's appraiser concluded that Delta's projected operating income, after deducting estimated taxes, totaled $552 million, almost $255 million less than the department's calculation.

■ In challenging the department's use of the limited-life model, Delta specifically argues that that model was inappropriate, because the department was valuing an ongoing unit of operating property.[11] At trial, the department's appraiser defended his use of the limited-life model, although he acknowledged that it might have overstated the present value of future income. He further testified that the perpetuity model was inappropriate here, because the objective was to value Delta's assets, which have finite lives, rather than Delta as a firm, which might continue into perpetuity.

As noted earlier, OAR 150-308.205-(B)(7)(a)(B) specifically requires that, when valuing an air-transportation company using the income approach, the department use the methods described in the WSATA Handbook. The handbook, in turn, answers the question whether use of the limited-life

---

[11] Delta also cites *Burlington Northern v. Dept. of Rev.*, 291 Or 729, 738-39, 635 P2d 347 (1981), for the proposition that a perpetuity model, rather than a limited-life model, is appropriate when conducting a unit valuation of a multi-state company. It is true that, in *Burlington Northern,* which involved a company in a regulated industry, this court rejected an approach similar to the department's and approved a perpetuity approach similar to Delta's. However, as this court repeatedly has stated, "when this court evaluates and then either accepts or rejects various theories of valuation offered by the parties, it almost always does so as a finder of fact on *de novo* review of the record made in the Tax Court." *United Telephone Co. v. Dept. of Rev.*, 307 Or 428, 431, 770 P2d 43 (1989). In short, "this court decides each case on its own record," *id.* at 432, and, consequently, earlier valuation cases provide no precedential value to our determination of the issues before us here. We further note that OAR 150-308.205-(B)(7)(a)(B), which requires the department to follow the WSATA Handbook in the income approach, was adopted *after* this court's decision in *Burlington Northern.*

or perpetuity model was appropriate in this case. The handbook provides that, when the taxation requirement is to value assets that exist on the assessment date, it is proper to forecast the expected income "over the remaining economic life of the existing assets," *i.e.*, to follow a limited-life model. WSATA Handbook at 45. In contrast, the handbook provides that "[f]orecasting income into perpetuity is proper when the corporate entity is being valued." *Ibid.*

Under Oregon law, taxable property must be assessed as of a particular assessment date. *See* ORS 308.515 (the department shall make an annual assessment of certain property having a situs in this state, including air transportation property); ORS 308.540 (1993) (the department shall prepare an assessment roll each year, "in which shall be assessed, as of July 1 at 1:00 a.m. of such year, the real market value of all the properties of the several companies subject to taxation under ORS 308.505 to 308.665"). Thus, the department's task in this case was to value Delta's taxable property, as a unit, as of the assessment date at issue. As discussed above, the WSATA Handbook provides that the limited-life model is the appropriate manner of valuing such property when using the income approach. In contrast, the perpetuity model would not have been appropriate here, because the department's task was to determine the value of Delta's assets, not the value of Delta as a firm. Accordingly, we reject Delta's contention that the department erroneously applied the limited-life model in its income approach.

2. *Specific challenges to the department's limited-life model*

 Delta also challenges certain aspects of the department's use of the limited-life model, contending that the department's appraiser improperly calculated the cost of capital maintenance and did not account for future capital investment requirements. As to the latter issue, we reject Delta's argument, because it primarily pertains to replacement costs of assets in the unit, which the department's appraiser did not account for, and the record and the WSATA Handbook indicate that the limited-life model is not concerned with such replacement costs. *See* WSATA Handbook at 66 (limited-life model values only assets existing as of the

assessment date; "future forecasts leave out both revenues and expenses associated with future replacement assets"). As to the former issue, although the record indicates that the department's appraiser might have overestimated the cost of Delta's capital maintenance, we cannot determine from the record the extent, if any, of that overestimation. Consequently, we cannot conclude that Delta has met its burden of proof in challenging the department's calculations using the limited-life model in the income approach. *See generally Publishers Paper Co. v. Dept. of Rev.*, 270 Or 737, 750, 530 P2d 88 (1974) (in challenging departmental assessment, taxpayer need not prove all the proposed change; rather, "[h]e must do no more than show that a reduction is appropriate *and furnish the court with information sufficient to calculate the reduction proved to be in order*" (emphasis added)).

B. *Cost Approach*

 1. *Obsolescence*

 Delta next contends that the Tax Court erred in rejecting Delta's cost approach, specifically, its use of the income-deficiency method to calculate an obsolescence factor of 56.7 percent. As noted, Delta's income-deficiency method calculated obsolescence by comparing the rate of return on the assets subject to taxation to the rate of return required to attract investment. Thus, that method relied upon figures calculated in Delta's income approach to determine obsolescence in the cost approach. *See* 328 Or at 605 n 6 (explaining Delta's use of the income-deficiency method). In Delta's view, an obsolescence adjustment was required in the cost approach, because the appraiser was required to determine what an investor would have been willing to pay for the assets in their present state as of the assessment date. As discussed earlier, Delta's appraiser calculated a preliminary value of Delta's taxable property, owned and leased, of $10,673,092,000 and, after using the income-deficiency method to calculate obsolescence, calculated a final value under the cost approach of $4,621,449,000.

 The department responds that Delta's income-deficiency method was fundamentally flawed, because it relied upon the net operating income figure from Delta's income approach, which did not incorporate a leased-equipment

adjustment. In the department's view, such reliance upon the income approach always will result in a valuation figure in the cost approach that mirrors the valuation figure in the income approach. In contrast to Delta's appraiser, the department's appraiser, who calculated a total value under the cost approach of $11,750,000,000 (as corrected during trial), did not make a separate adjustment for obsolescence.

■ After reviewing the record, we conclude that Delta has not proved by a preponderance of the evidence that we must adopt its cost approach incorporating the income-deficiency method. Predictably, each appraiser testified that his approach was correct; no other witness testimony supported either competing contention. In addition, Delta submitted two articles, only one of which supported its use of the income-deficiency method in the cost approach to value. In short, we are unable to conclude from the evidence before us what type of obsolescence adjustment—if any—is required.[12]

Further, we find it significant that, as Delta's appraiser testified, by using the income-deficiency method, his cost indicator always would have equaled his income indicator, because his cost indicator measured obsolescence by examining the projected income stream. At best, therefore, Delta's income-deficiency method is illogical, because it incorporates income figures that account for only owned assets, while it uses cost figures that account for both owned and leased assets. At worst, Delta's income-deficiency method strips the cost approach of its use as an independent determiner of value, because it always will track the result under the income approach.

---

[12] The WSATA Handbook does not provide a clear answer on this issue. The handbook provides that, when conducting a valuation under the cost approach by examining historical costs less depreciation, as both appraisers did here, obsolescence deductions are improper for cost-regulated companies or utilities. WSATA Handbook at 27. However, the handbook does not mention whether, or what type of, obsolescence adjustment is proper when analyzing historical costs less depreciation for other companies. The WSATA Handbook does support using the income-deficiency method to calculate obsolescence, but only in certain circumstances that do not exist here. WSATA Handbook at 31-32. In sum, the handbook does not speak to the appropriateness of an obsolescence adjustment, using the income-deficiency method or some other method, when appraising an airline such as Delta.

For the foregoing reasons, we conclude that Delta's arguments concerning the income-deficiency method are not well taken.

## 2. *Depreciation*

■ Delta also challenges the department's cost approach to value because, in Delta's view, the department's appraiser used inaccurate depreciation figures that inflated his final value calculation. As noted earlier, the department's appraiser developed his own market-based depreciation scheme—which, in his view, incorporated obsolescence—for all Delta's owned and leased aircraft, by relying upon value figures reported by Avmark, Inc., an organization that provides various services in the airline industry, including appraisals and valuation studies. In contrast, Delta's appraiser applied book depreciation for all Delta's taxable assets in his cost approach, rather than conducting a separate market-transaction analysis.

Delta asserts that it is not feasible to conduct a true market-transaction analysis of the aircraft market and, consequently, Delta's use of book depreciation was appropriate when calculating value in the cost approach. Additionally, Delta argues that the Avmark data relied upon by the department's appraiser to calculate depreciation did not accurately reflect aircraft-sales transactions and, as a result, his entire cost approach was fundamentally flawed.

The department responds that Delta's use of book depreciation was inappropriate in the cost approach, because book depreciation is irrelevant when determining the true value of the assets subject to taxation. Thus, in the department's view, an actual market-transaction analysis was required. The department further contends that the Avmark data provided a reliable source of the information necessary to conduct such an analysis.

The parties' competing contentions center upon the validity of certain Avmark data as accurate indicators of the market value of aircraft similar to those owned and leased by Delta. The department's appraiser relied upon a 1991 Avmark publication, entitled "Current Aircraft Values," to develop his depreciation scheme. The department contends

that the data set out in that publication were derived from an analysis of actual market transactions. In response, Delta contends that the data were unreliable and, consequently, did not provide an accurate basis to calculate depreciation.

The evidence in the record supports Delta's contention. First, the record demonstrates that it is difficult to develop a pricing schedule in the airline industry, because there is little reliable information concerning aircraft market prices. For example, in contrast to the "blue book" in the motor-vehicle market, there are comparatively fewer sales in the aircraft market, and sales agreements often are confidential. In addition, sales of aircraft often involves "extras," such as spare parts and training.

Second, the record demonstrates that the Avmark data at issue were not based solely upon an analysis of market-sales transactions. According to the testimony of the department's appraiser, he understood that the schedules that he used from the 1991 "Current Aircraft Values" were based upon such transactions. However, Delta's appraiser testified persuasively on rebuttal that a sales-price analysis constituted only a small component of the figures set out in that publication. According to Delta's appraiser, Avmark developed the figures that the department's appraiser relied upon by projecting revenues and expenses, discounted to present value, and then adjusting those figures to compensate for a variety of factors that, in Avmark's subjective judgment, might have been relevant to estimating market value. One of those factors was sales price. Avmark calculated its figures in that manner because there was insufficient sales-price information available to develop values based only upon such prices. In short, the figures that the department's appraiser relied upon did not represent market-transaction figures in and of themselves; rather, they represented Avmark's projected values based only in small part upon available market-transaction data. As a result, the data relied upon by the department's appraiser did not measure market activity to the extent that he had testified and, consequently, did not accurately measure market depreciation.[13]

---

[13] Delta's appraiser also testified that a different Avmark schedule might have been helpful in calculating depreciation; however, the department's appraiser did not use that schedule.

Finally, two other witnesses, both of whom were airline employees engaged in the acquisition of aircraft, testified in Delta's behalf that Avmark typically overstated the value of aircraft. Those witnesses cited specific examples demonstrating that Avmark had overestimated the value of certain airplanes by between $2 million and $12 million. The department presented no evidence to contradict that testimony.

In sum, we conclude that Delta has proved by a preponderance of the evidence that the depreciation figures in the department's cost approach to value were based upon unreliable information.[14] The next question before us, then, is how to remedy that problem. The record demonstrates that a market-based depreciation scheme would have been preferable to book depreciation, because a market-based scheme more accurately would have reflected the value of property under the cost approach. However, the record contains only book-depreciation figures, used by Delta's appraiser, and depreciation figures based upon Avmark data—which we have concluded did not accurately reflect depreciation—used by the department's appraiser. In view of the fact that the record contains only those two competing choices, a choice must be made. We conclude that, in this case, Delta's use of book depreciation in the cost approach was more reliable than the department's depreciation scheme.

---

In his cost approach, the department's appraiser also used data contained in a 1993 Avmark publication to make a real market value adjustment. That data represented sales prices for certain aircraft. In making the adjustment, the department's appraiser calculated a total value under the cost approach that exceeded his earlier value using his depreciation scheme based upon Avmark's 1991 "Current Aircraft Values" publication. In the appraiser's view, his second, higher calculation confirmed that his earlier valuation, based upon the 1991 publication, was reasonable.

On review, the department asks this court to accept its appraiser's second, higher calculation, based upon the 1993 Avmark publication, as the most reliable indicator of the value of Delta's owned and leased aircraft. However, that calculation was not presented below as a substitute for the department's trial appraisal. Further, the department's appraiser made a number of last-minute adjustments to his second, higher calculation during trial. In short, the record does not demonstrate that we should consider the department's second, higher calculation to represent either an accurate reflection of a value figure under the cost approach or a substitute approach to valuing Delta's assets.

[14] We emphasize that we do not hold that Avmark is an inappropriate source of data in every case. Rather, we conclude that the department's depreciation scheme in the record here did not reliably reflect depreciation.

■ At bottom, we still must determine the appropriate value of Delta's taxable property under the cost approach. Delta's appraiser concluded that the historical cost of Delta's property less book depreciation totaled $10,673,092,000. He then applied his obsolescence factor of 56.7 percent, which we have rejected as a reliable indicator of obsolescence, and concluded that the value of Delta's taxable assets under the cost approach was $4,621,449,000. The department's appraiser concluded that Delta's historical costs less depreciation, based upon his Avmark depreciation scheme, totaled $11,750,000,000 (as corrected during trial). The department's appraiser did not make a separate adjustment for obsolescence because, in his view, his market analysis based upon Avmark data accounted for all types of obsolescence. In short, Delta's appraiser made a separate adjustment for depreciation, which we have approved, and for obsolescence, which we have rejected; the department's appraiser made only one adjustment that accounted for both depreciation and obsolescence, which we have rejected. The difficulty, then, is determining an appropriate valuation figure under the cost approach, when there is insufficient information in the record concerning the appropriate obsolescence adjustment, if any.

We conclude that a reasonable value of Delta's taxable property under the cost approach is $10,673,092,000, which was Delta's determination of historical cost less book depreciation, before adjusting for obsolescence. That figure is more than $1 billion less than the department's value using the cost approach, although it also is more than $6 billion above Delta's value using the cost approach, which made a separate deduction for obsolescence. We recognize that an obsolescence adjustment might result in a more accurate figure; however, as we have discussed, there is insufficient information in the record concerning such an adjustment. *See generally Reynolds Metals Co.*, 299 Or at 602-03 (demonstrating that, if possible, court must determine reasonable valuation figure based upon record); *Publishers Paper Co.*, 270 Or at 750 (record at least must contain sufficient information to calculate warranted reduction). We further conclude that, because our determination of value under the cost approach likely is incomplete, the cost approach should be given the

least amount of weight of the three approaches to value when calculating a final value of Delta's taxable property.

## C. *Stock and Debt Approach*

Finally, Delta challenges two aspects of the department's stock and debt approach, aside from its contention—which we have rejected—that the department should not have made a leased-equipment adjustment. First, Delta argues that the department's appraiser erroneously included certain deferred credits when calculating Delta's liabilities. In Delta's view, such credits, which represented deferred taxes and gains on certain sale and lease-back transactions, were not traded securities and did not contribute capital to Delta (as did equity and debt); rather, they merely represented accounting or bookkeeping adjustments. Second, Delta contends that the department's appraiser incorporated the incorrect total of shares of stock in his approach. In Delta's view, this court should accept its stock and debt value of $6,786,155,000, and reject the department's final value in its trial appraisal of $12,034,127,000.

At trial, Delta demonstrated that the department's appraiser incorporated questionable figures in his stock and debt approach, and did not understand fully either the nature of Delta's deferred credits or the extent to which those credits should have been included when calculating Delta's total debt.[15] However, as did the Tax Court, we find it significant that, before the leased-equipment adjustment, the department's preliminary value under the stock and debt approach—$6,774,133,000—was remarkably similar to Delta's final value, which did not include a leased-equipment adjustment.[16] As explained earlier, it was proper for the department to make a leased-equipment adjustment under OAR 150-308.205-(B)(7)(b). *See* 328 Or at 610 (so explaining).

---

[15] For example, the department's appraiser assumed that the majority of Delta's deferred credits represented deferred income taxes, when the record demonstrates that the majority of Delta's deferred credits instead related to deferred gains. The department's appraiser also testified that he was not familiar with Delta's deferred-gain credits and did not necessarily know if they should have been included when calculating the value of Delta's debt.

[16] Indeed, before the leased-equipment adjustment, the department's value under the stock and debt approach was more than $12 million *less* than Delta's final value of $6,786,155,000 under the stock and debt approach.

We therefore conclude that the department's initial stock and debt value of $6,774,133,000, when added to the modified leased-equipment adjustment of $4,448,460,053, *see* 328 Or at 614 (explaining modified adjustment), reflects the most reasonable calculation of Delta's taxable property under the stock and debt approach. Accordingly, we hold that the appropriate value of Delta's taxable property under the department's stock and debt approach is $11,222,593,053. However, in view of the problems in the department's approach exposed by Delta at trial, we conclude that the department's stock and debt value, as modified, should not be given great weight in calculating a final, system-wide valuation figure for Delta's taxable property.

## V. CONCLUSION

In sum, we conclude that it was permissible for the department to make a leased-equipment adjustment in its income and its stock and debt approaches to valuing Delta's taxable property. However, we adopt a modified leased-equipment adjustment under those two approaches, as well as a modified value figure under the cost approach, as set out below.

As to the income approach, other than our modification of the amount of the leased-equipment adjustment, we reject Delta's specific challenges to the department's manner of adjusting for the value of Delta's leased aircraft, as well as its other criticisms of the department's income approach. We conclude that a reasonable value under the income approach is $10,521,454,019, rather than the $11,207,330,000 value figure included in the department's trial appraisal.

As to the cost approach, we agree with Delta that the department utilized erroneous depreciation figures and conclude that $10,673,092,000, rather than the $11,750,000,000 value figure presented by the department's appraiser (as corrected during trial), is a reasonable value figure. We further conclude that, in calculating a final value figure, the cost approach should be given the least weight of the three approaches to value.

Finally, as to the stock and debt approach, we conclude that $11,222,593,053 is a reasonable value figure,

rather than the $12,034,127,000 figure included in the department's trial appraisal. We further conclude that, in light of certain methodological errors highlighted by Delta at trial, the department's stock and debt approach should not be given significant weight in calculating a final value figure.

Consistent with the foregoing, we calculate a new, system-wide value for Delta's operating property, as follows (rounded to the nearest dollar):

| | | |
|---|---|---|
| Income: | $10,521,454,019 x 60% = | $6,312,872,411 |
| Cost: | 10,673,092,000 x 10% = | 1,067,309,200 |
| Stock and Debt: | 11,222,593,053 x 30% = | 3,366,777,916 |
| Total System-Wide Value: | | $10,746,959,527 |

*See generally United Telephone Co. v. Dept. of Rev.*, 307 Or 428, 447, 770 P2d 43 (1989) (employing same reconciliation methodology).

As did both parties in their appraisals, we now determine the Oregon value of Delta's taxable property by applying an allocation factor of 0.6742 percent and a real market value adjustment of eight percent, as follows (rounded to the nearest dollar):

| | |
|---|---|
| System-Wide Value: | $10,746,959,527 |
| x Allocation Factor: | x .006742 |
| | 72,456,001 |
| Less 8% RMV Adjustment:. | (5,796,480) |
| Total Oregon Value: | $ 66,659,521 |

The judgment of the Tax Court is modified accordingly.

The judgment of the Tax Court is modified, and the case is remanded to the Tax Court for further proceedings.