Argued and submitted March 16, judgment of Tax Court affirmed July 1, 2021

## LEVEL 3 COMMUNICATIONS, LLC,
*Plaintiff-Appellant,*

*v.*

## DEPARTMENT OF REVENUE,
State of Oregon,
*Defendant-Respondent.*

### (TC 5236 (Control), 5269, 5291) (SC S067283)

490 P3d 149

Level 3 challenged the Tax Court's determination of the real market value of its tangible and intangible property for the 2014-15, 2015-16, and 2016-17 tax years, arguing that the Tax Court erroneously concluded that the central assessment statutory scheme permits taxation of the entire enterprise value of the company, as opposed to permitting taxation only of a company's property. *Held*: The Tax Court correctly determined that the central assessment statutes permit the Department of Revenue to rely on the enterprise value of a company and attributes such as the possibility of acquiring future tangible and intangible property, the present value of its growth opportunities, and potential mergers and acquisitions, as reliable indicators of the value of a company's property for central assessment purposes, and it correctly accepted Department of Revenue's valuations of the company's property for the tax years at issue.

The judgment of the Tax Court is affirmed.

On appeal from the Oregon Tax Court.*

Robert T. Manicke, Judge

Cynthia M. Fraser, Foster Garvey PC, Portland, argued the cause and filed the briefs for appellant. Also on the briefs was Daniel L. Keppler.

Marilyn J. Harbur, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Jordan R. Silk, Assistant Attorney General.

Per A. Ramfjord, Stoel Rives LLP, Portland, filed the brief of *amicus curiae* Council on State Taxation. Also on

_____
* 23 OTR 440 (2019).

the brief was Nikki E. Dobay, Tax Counsel, Council on State Taxation.

Before Walters, Chief Justice, and Balmer, Nakamoto, Duncan, Nelson, and Garrett, Justices, and Kistler, Senior Judge, Justice pro tempore.**

NAKAMOTO, J.

The judgment of the Tax Court is affirmed.

_____

** Flynn, J., did not participate in the consideration or decision of this case.

## NAKAMOTO, J.

On appeal from the judgment of the Oregon Tax Court, taxpayer Level 3 Communications, LLC (Level 3), a centrally assessed communication company, challenges the Tax Court's determination of the real market value of its tangible and intangible property for the 2014-15, 2015-16, and 2016-17 tax years.[1] Level 3 argues that the Tax Court held that the central assessment statutory scheme permits taxation of the entire enterprise value of the company, contrary to the wording of applicable statutes that permit taxation only of a centrally assessed corporation's property. According to Level 3, the Tax Court applied that erroneous holding to incorrectly accept the Department of Revenue's (the department's) valuations of Level 3's property for the relevant tax years. We conclude that Level 3 has misconstrued the Tax Court's decision and, for the reasons set out below, that the Tax Court did not err by accepting the department's valuations. Accordingly, we affirm the Tax Court's judgment.

## I.  BACKGROUND

A.  *Level 3's Business*

The following facts are undisputed. At all times relevant to this case, Level 3 owned and operated a worldwide optical fiber network that transmitted data using light waves. Level 3 was headquartered in Colorado and owned property throughout North America, including in Oregon. When Level 3 installed its network in the 1990s, consisting of fiber optic cables strung across continents and under oceans, it installed 12 conduits to house the optic fiber for each cable, with the expectation that all would be needed eventually to accommodate future growth. However, over the years, innovations in the technology used in optical communication equipment allowed Level 3 to grow its network and increase data transmission volume without expanding its fiber network. Indeed, as a result of changing technology, Level 3 used only a small fraction of the original 12 conduits during the tax years at issue.

_____

[1] Level 3 was sold in 2017. However, during all the tax years at issue, taxpayer was subject to central assessment by the Oregon Department of Revenue in Oregon under ORS 308.514(1)(h).

Those constant advances in data transmission technology also effectively rendered Level 3's network equipment obsolete shortly after installation, because newer equipment immediately became available that could transmit a greater volume of data at a lower cost per unit. And, because of competition in the market, any cost savings spurred by technological change had to be passed on to Level 3's customers in the form of lower prices on a per-unit basis. Therefore, to grow its revenues, Level 3 was required to continually increase the volume of network capacity it sold to its customers. But, due to the virtually immediate obsolescence of its equipment, it could only do so by procuring new, up-to-date equipment or by acquiring other telecommunications companies that had the needed equipment and integrating their networks into its existing network. Level 3's revenue growth over the years was attributable largely to its acquisition of other companies.

B.  *Level 3 disputed the department's assessment.*

As a communication company, Level 3 was subject to central assessment. Under ORS 308.515(1)(h),[2] the department may tax "any property that has a situs in this state and that *** is used or held for future use by any company in performing or maintaining" a communication business. The term "property" for purposes of central assessment means "all property of any kind, whether real, personal, tangible or intangible," that is used or held for the performance or maintenance of the centrally assessed business, except for claims on other property and shares of stock. ORS 308.505(14). Central assessment is generally accomplished through "unit valuation," which is permitted by and described in ORS 308.555. Under ORS 308.555, the department may value the entire property, "both within and without the State of Oregon, as a unit," and then make deductions for property situated outside the state or not connected directly to the centrally assessed business. *See Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 290-93,

---

[2] The central assessment statutes have been amended in various ways since 2014. However, in all ways material to this case, they are identical to the version of the statutes currently in effect. For that reason, we cite to the current version of the statutes in this opinion.

337 P3d 768 (2014) (describing central assessment by unit valuation).[3]

Level 3 challenged the department's assessments of its property for the 2014-15, 2015-16, and 2016-17 tax years in the Tax Court, arguing for a reduction in the real market value of the property for each tax year at issue. At trial, the parties submitted competing appraisals of Level 3's property through the parties' experts' written analyses.

Under OAR 150-308-0260(3)(a), appraisers must use three customary approaches when determining real market value of industrial property—the income approach, the cost approach, and the market, or comparable sales, approach[4]—but the rule recognizes that some approaches to valuation may not be appropriately applied to a particular property. As this court has summarized,

> "[those] approaches are named for the types of indicators that the appraiser uses to estimate the value that a purchaser in the market would pay for the property. The cost approach considers the cost of constructing a substitute property that provides the same utility as the subject property at its highest and best use; the income approach relies on the income stream that the property generates; and the comparable sales approach examines the prices that buyers have paid for similar properties."

*Seneca Sustainable Energy, LLC v. Dept. of Rev.*, 363 Or 782, 799, 429 P3d 360 (2018) (citations and internal quotation marks omitted).

---

[3] In *Comcast*, the issue was whether a data transmission company such as Comcast was subject to central assessment. 356 Or at 284. In this case, all parties agree that Level 3 is a communication company subject to central assessment.

[4] Under OAR 150-308-0695(2), the market approach is referred to as the "stock and debt approach":

> "ORS 308.555 [Unit valuation of property] authorizes the department to value all property of a centrally assessed company as a unit. Unit valuation means valuing an integrated group of assets functioning as an economic unit as 'one thing,' without reference to the market value of any individual assets. To determine a company's unit value, the department considers one or more of the cost, income and stock and debt approaches to value, reconciling the approaches to arrive at 'unit value' also referred to as the 'correlated system value.'"

In the Tax Court, Level 3 relied exclusively on the income approach.[5] Level 3 did perform a cost approach analysis, but, in the Tax Court, it used it only as a "high benchmark" of value and assigned it no weight. Level 3's appraisers did not perform an analysis using the market approach.

The department undertook an analysis using all three approaches. It relied most heavily on the income approach. It placed "significant" reliance on the market approach and placed the least reliance on the cost approach.

The parties' appraisals differed significantly, largely as a result of the parties' differing views of what constitutes taxable "property" under the central assessment statutes. Level 3 argued that a centrally assessed company is distinct from the property that it owns, holds, or uses, and, therefore, the department could not include in its determination of value any items that are attributable to the value of Level 3 as a company, such as, for example, the company's ability to acquire property in the future and put that property to profitable use. Level 3 argued that the department had included improper items in its unit valuation, and it asked the Tax Court to reject the department's valuations for the tax years at issue for that reason. The department argued that the Tax Court should accept its appraisals and reject Level 3's arguments about the limits of "property" subject to the central assessment statutes.

## C.   *The Tax Court Opinion*

The Tax Court issued an opinion generally upholding the department's valuation determinations for the tax years at issue. *Level 3 Communications LLC III v. Dept. of Rev.*, 23 OTR 440 (2019). Because Level 3's appeal turns in

---

[5] As this court explained in *Delta Air Lines, Inc. v Dept. of Rev.*, 328 Or 596, 603, 984 P2d 836 (1999),

"[g]enerally speaking, the income approach measures the present value of the anticipated future stream of income attributable to the company's operating property, by discounting the company's anticipated cash flows to present value using a capitalization rate that reflects the company's costs of investment."

The income approach thus assumes that an income-producing property is worth the present value of its net future income stream.

part on its view of the Tax Court's rationale, we review the opinion in detail.

At the outset, the Tax Court agreed that resolution of the dispute turned on what the legislature intended in its definition and use of the word "property" in the central assessment statutes. *Level 3 Communications*, 23 OTR at 443-45. The court analyzed the parties' legal arguments in light of the three customary approaches to determining real market value of property, but, because both parties' appraisers relied heavily on the income approach, the Tax Court focused its analysis there.

The department's appraisers and Level 3's appraisers reached dramatically different values for Level 3's property using the income approach; the department's values for each of the relevant tax years were at least double those of Level 3. The Tax Court observed that the major differences in the parties' valuations were due to their assumptions about predicted revenue growth for the company. *Id.* at 447-48. Level 3 did not argue that the company had no prospects for growth; both parties predicted steady revenue growth for the company as a whole. However, Level 3 argued that it was not appropriate to base the income forecast on the income of the company as a whole. Rather, its forecast relied principally on the value of the tangible property that it owned on the assessment dates, which, it argued, was close to zero, because its tangible property on those dates was essentially obsolete. Based on that premise, Level 3 forecast no revenue growth attributable to its operating property.

Level 3 argued that the department's forecast erroneously inflated revenue by including revenue from property that Level 3 would have had to acquire after the assessment dates. Level 3 described the possibility of acquiring future tangible and intangible property, the present value of its growth opportunities, and potential mergers and acquisitions, among other things, as "investment attributes," which, it contended, are attributes inhering in the stock or other ownership interests of the company. In other words, Level 3 asserted, the value of those investment attributes reflects investors' willingness to invest in Level 3's shares of stock

and cannot be valued separately apart from the company. Thus, in accordance with Level 3's view of "property" subject to central assessment, valuing these attributes would amount to valuing the company itself and not its property. According to Level 3, because investment attributes are not "property" that a company can "use and hold," they are not taxable.

The Tax Court agreed that the department's appraisals relied in part on the value of those investment attributes and that the investment attributes are attributes of the stock or other ownership interests in the company. *Id.* at 443-46. It therefore considered whether and to what extent the value of the company—including attributes such as the possibility of acquiring future tangible and intangible property, the present value of a company's growth opportunities, and potential mergers and acquisitions—may permissibly inform a determination of the unit value of centrally assessed property under the income approach to valuation. *Id.* at 446-50. In doing so, the court employed this court's methodology for interpreting statutes as explained in *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009) (prescribing consideration of text, context, and legislative history of the statutes at issue to determine the intent of the legislature that enacted the statutes).

The court began by examining the text and context of several applicable statutes: ORS 308.515(1) (prescribing the department's duty to "make an annual assessment of any property that has a situs in this state"); ORS 308.505(14) (defining "property" that the department can value and assess as "all property of any kind, whether real, personal, tangible or intangible, that is used or held by a company * * * for the performance or maintenance of a business or service"); ORS 308.520[6] to 308.525 (describing data that centrally assessed companies are required to report to the department); and ORS 308.545 to 308.555 (setting out instructions for "unit" valuation of property, which permits the department to value the entire property of the company, both within and without the state, and then make

---

[6] The Tax Court reviewed the applicable 2013 versions of the statutes. In 2019, ORS 308.520 was renumbered as ORS 308.524.

deductions for property outside the state or not directly connected to the centrally assessed business). The court concluded that the text of those statutes neither clearly includes investment attributes as part of the property to be taxed nor clearly excludes them. *Level 3 Communications*, 23 OTR at 456.

The court noted that key terms are left undefined in the central assessment statutes. "Intangible property" is not defined, and ORS 308.505(14)(b), which provides a nonexclusive list of items included within the definition of "property," specifically references two types of intangible property, namely, "franchise" and "special franchise," that also are not defined in the statutes. *Id*. The court examined the historic dictionary definitions of those terms, which have been part of the statute since its enactment in 1909, to help unearth what the legislature intended "intangible property" to mean. *Id*. at 456-57. But the court concluded that the plain meanings of the terms "intangible property," "franchise," and "special franchise" did not help it to determine whether the department can take into account the value of the company as a whole or the intangible investment attributes of shares of corporate stock when determining the value of a centrally assessed company's property.[7] *Id*. at 457-58.

The Tax Court then turned to the text of ORS 308.545, one of the statutes describing how to assess and value the tangible and intangible property of centrally assessed companies as a unit. That statute provides:

---

[7] The version of *Black's Law Dictionary* published most closely in time to the enactment of the statutes defined the phrase "intangible property" as follows: "Used chiefly in the law of taxation, this term means such property as has no intrinsic and marketable value, but is merely the representative or evidence of value, such as certificates of stock, bonds, promissory notes, and franchises." *Black's Law Dictionary* 643 (2d ed 1910). The 1907 edition of *Webster's International Dictionary* defined "franchise" as a "particular privilege conferred by grant from a sovereign or a government, and vested in individuals; an immunity or exemption from ordinary jurisdiction; a constitutional or statutory right or privilege, esp. the right to vote." *Webster's Int'l Dictionary of the English Language* 592 (1907). The 1910 edition of *Black's Law Dictionary* was similar, but drew a distinction between "franchise" and "special franchise": "The charter of a corporation is its 'general' franchise, while a 'special' franchise consists in any rights granted by the public to use property for a public use but with private profit." *Black's* at 519.

"For the purpose of arriving at the amount and character and assessed value of the property belonging to a company, the Department of Revenue \*\*\* may take into consideration the statements filed under ORS 308.505 to 308.674, the reports, statements or returns of the company filed in the office of any board, office or commission of this state, or any county thereof, the earning power of the company, the franchises and special franchises owned or used by the company, and such other evidence of any kind that is obtainable bearing thereon."

ORS 308.545.

The court stated that ORS 308.545 expressly allows the department to consider the value of the company's stock and the amount of the company's income when valuing the company's property, and it does so in two ways: by allowing the department to "take into consideration" the annual statements that a company files under ORS 308.525, which disclose the company's stock value, income, and other items, and by expressly stating that the department may consider "the earning power of the company" as well as the "franchises and special franchises" owned or used by the company. *Level 3 Communications*, 23 OTR at 457-58. The court noted that, while the text of ORS 308.545 does not specify what weight to assign those factors, it does not rule out the possibility of equating the value of a company's stock and its earning power with the unit value of a centrally assessed company's tangible and intangible property. *Id*. Rather, according to the Tax Court, in permitting the department to consider the company's stock value, income, and earning power, the text of ORS 308.545 strongly suggests that the legislature viewed the ability of the company as an entity to earn revenue as relevant to the unit value of a company's property. *Id*.

Turning to context, the Tax Court focused on the use of the terms "franchise" and "special franchise" in the definition of "property." The court examined early state and federal case law and the contemporaneous dictionary definitions of those terms, and it concluded that the legislature that enacted the central assessment statutes in 1909 would have understood a "franchise" to be intangible property consisting of a set of rights that were not transferable or, in the case of

special franchises, were transferrable only with the consent of the public body franchisor. *Id*. at 459. In the Tax Court's view, the legislature's choice to identify as taxable "property" an item that could not be separated from its corporate owner buttressed the conclusion that investment attributes of stock ownership—which also cannot be separated from the corporate owner—are taxable intangible property for purposes of the central assessment statutes. *Id*.

The Tax Court then examined the legislative history of the central assessment statutes. Among other things, the Tax Court considered three United States Supreme Court cases involving central assessments of railroads and telephone companies decided before 1909, when Oregon's statute was enacted: *Taylor v. Secor*, 92 US 575, 2 Otto 575, 23 L Ed 663 (1875); *Adams Express Company v. Ohio*, 166 US 185, 17 S Ct 604, 41 L Ed 965 (1897); and *Sanford v. Poe*, 165 US 194, 17 S Ct 305, 41 L Ed 683 (1897). *Level 3 Communications*, 23 OTR at 461-64. Those cases described the intentions behind and effects of central taxation and unit valuation. They discussed with approval the inclusion of intangible property in valuations of the market value of a centrally assessed company's property, as well as the notion that the value of the total shares of a company's stock held by its shareholders was an appropriate guide to determining the value of a company's tangible and intangible property in a state. This court recognized that principle in *Comcast*:

> "Central assessment also allowed assessors to capture additional value inherent in certain property. In particular, central assessment made possible assessments which would reach those large intangible values, called franchise value or good will, which could not be effectively taxed by local assessors."

356 Or at 290 (internal quotation marks omitted).

The Tax Court also considered the major legislative developments in Oregon leading up to the 1909 enactment of the central assessment statutes, in light of then-current case law. In particular, the court pointed to *O. & C. R. R. v. Jackson County*, 38 Or 589, 65 P 307, *modified on reh'g*, 38 Or 589, 65 P 369 (1901), which, the court stated, appeared to determine the unit value of a railroad company, years before the legislature had enacted legislation explicitly authorizing

that valuation method. *Level 3 Communications*, 23 OTR at 468. Importantly, according to the Tax Court, this court also appeared to place its imprimatur on a stock and debt approach to valuation:

> "'So, too, the value of stocks and bonds may furnish an element by which to determine the worth of such property. The conditions which may unite to influence the market must be borne in mind, as they may be unnatural, and out of the usual course; *but the criterion is one that may be legitimately resorted to in determining the value of the property which they represent*.'"

*Id*. at 468 (quoting *O. & C. R. R*., 38 Or at 608 (emphasis added in *Level 3 Communications*)).

With those things in mind, the Tax Court examined the 1909 version of the central assessment statutes and stated:

> "The court finds the 1909 definition of 'property' remarkable for its emphatic breadth, using the phrase 'all property,' or variants thereof, a total of three times. The definition immediately declares that 'property' includes 'all property, real and personal,' belonging to or held by the company. The definition goes on to list a number of specific items, but again adds "and all other property of a like or different kind' used in the business, as well as 'all other real and personal property,' finally adding 'and all franchises and special franchises' before concluding with the proviso that excludes certain property not used in the centrally assessed business. Or Laws 1909, ch 218, § 5. Based on this repeated intention to include 'all' property, the court concludes that the legislature intended 'property' and its constituent terms, such as 'franchise,' to be interpreted expansively."

*Level 3 Communications*, 23 OTR at 474 (footnote omitted).

In addition, the Tax Court reasoned that the legislature would have known, from the pre-1909 United States Supreme Court cases cited above, "that the United States Constitution would allow Oregon to treat the value of all shares in a company as equivalent to the value of the entirety of a corporation's tangible and intangible property." *Id*. at 474-75. In addition, referring again to this court's decision in *O. & C. R. R*., the court stated that, at the

time of the enactment of the central assessment statutes, the "[Oregon] legislature would have been aware that the Oregon Supreme Court eight years previously had endorsed a valuation method that primarily used the net earnings of the company, and also commented favorably on using the value of shares of company stock and debt, assuming that an adequate market existed for the shares of stock and that property not used in the unit could be excluded." *Id*. The Tax Court concluded that,

> "despite the important differences for many purposes between the property held or used by the corporation and shares held by the shareholders, the legislature in 1909 intended to authorize the Department's predecessor to treat the value of the total shares as equivalent to the value of the unit of corporate property for property tax purposes, at least absent some factual reason not to do so."

*Id*. at 475.

The court then considered whether the legislature intended any of its subsequent amendments of the central assessment statutes over the years to change the way centrally assessed property could be valued.[8] The court concluded that, overall, the statutory changes over the years did not change the central assessment statutes in ways that conflicted with the legislature's original intent that the value of the property held by a centrally assessed company may be determined by reference to the value of the company itself, absent evidence of a demonstrable difference. *Id*. at 477-78.

---

[8] The Tax Court considered the following amendments: In 1913, the legislature added the phrase "tangible and intangible" to the definition of property, Or Laws 1913, ch 193, § 5; the Tax Court viewed that change either as a clarification of the 1909 statute's reference to "all property" or as a further broadening of the definition. In 1941, the legislature added a provision making all property tax a personal debt of the centrally assessed taxpayer, Or Laws 1941, ch 12, § 1; the Tax Court viewed that amendment as closely identifying centrally assessed companies with their property. In 1977, the legislature added a specific exclusion from the definition of property for certain intangible property representing shares of stock or claims on other property (bonds and other debt instruments), Or Laws 1977, ch 602; the Tax Court stated that legislative history showed that that amendment merely codified a practice that had been in place from the statutes' enactment. And in 2015, the legislature adopted an exemption for a portion of the real market value of a centrally assessed company's property, Or Laws 2015, ch 23, § 3; the court found that nothing in that amendment changed the approach to valuing the unit of property. *Level 3 Communications*, 23 OTR at 475-78.

Finally, the court considered Level 3's argument that this court has clearly stated that Oregon's central assessment tax regime taxes the value of a company's property and not the value of the company itself. Level 3 was referring to the following statements: In *Delta Air Lines, Inc. v Dept. of Rev.*, 328 Or 596, 616, 984 P2d 836 (1999), this court stated that "the department's task was to determine the value of Delta's assets, not the value of Delta as a firm." And in *Comcast*, 356 Or at 294, this court stated that "[i]t bears emphasizing * * * that only the *property* used in the business, service, or commodity is assessed (and thus taxed). The value of the business, service, or commodity itself is not subject to central assessment." (Emphasis in original.) The Tax Court concluded that the context in which the court made each of the foregoing statements was entirely distinguishable from the present case,[9] and neither *Delta* nor *Comcast* stands for the proposition that the

_____

[9] The Tax Court noted that, in *Delta*, the main issue was the treatment of a substantial portion of the company's leased aircraft fleet. *Level 3 Communications*, 23 OTR at 478. Delta had performed an income approach analysis based on the so-called "perpetuity model," in which it assumed that it would enter into new aircraft leases continually and into the indefinite future as the current ones expired. As the Tax Court explained, the effect of that assumption was that Delta's prediction of future income depended on the net rather than the gross income stream for each aircraft (that is, it excluded lease payments to the lessors). In contrast, the department's valuation started with the gross earning potential of each aircraft, with deductions for financing costs and depreciation over the term of the aircraft's useful life. *Id.* at 478-80. The court rejected Delta's perpetuity model because it conflicted with an administrative rule then in effect. The Tax Court stated that it was in the course of the court's rejection of the perpetuity model that the court made the statement that Level 3 now points to: "'[T]he perpetuity model would not have been appropriate here, because the department's task was to determine the value of Delta's assets, not the value of Delta as a firm.'" *Level 3 Communications*, 23 OTR at 479 (quoting *Delta*, 328 Or at 615-16). For that reason, the Tax Court stated that it determined that it was appropriate to "interpret[] the language in *Delta* on which [t]axpayer relie[d] as primarily directed at rejecting Delta's attempt to discount the projected revenue stream based on Delta's choice to lease its income-producing property instead of owning it." *Level 3 Communications*, 23 OTR at 480-81.

As for this court's statement in *Comcast* that only the property used in the business, and not the business itself, is assessed and taxed, the Tax Court observed that that comment appeared as part of this court's introduction to the concepts of central taxation and was the only statement in a lengthy opinion that mentioned a distinction between the property and the business. As the Tax Court correctly noted, *Level 3 Communications*, 23 OTR at 481, this court never reached that issue in *Comcast*, because the court focused instead on the only issue presented in the case: whether Comcast was engaged in a "communication" business under ORS 308.515.

department's use of the value of a company or its shares of stock as an indicator of, or proxy for, the value of its property as a unit is invalid as a matter of law. The court summarized its analysis to that point as follows:

"The court sees no indication in the statutory text or context that the legislature has imposed any legal requirement to distinguish between the value of the company to its shareholders and the value of all of the company's tangible and intangible property. Indeed, the legislature has blurred the line between the centrally assessed company and the property it uses, most notably by incorporating into the definition of 'property' a corporation's inalienable right to exist."

*Level 3 Communications*, 23 OTR at 482.

Having concluded, based on text, context, and legislative history, that the central assessment statutes permit the department to consider the enterprise value of the company in determining the value of a company's property, the court turned to the specific question whether investment attributes such as the possibility of acquiring future tangible and intangible property, the present value of a company's growth opportunities, and potential mergers and acquisitions, can inform the department's determination of the unit value of centrally assessed property.

To answer that question, the Tax Court considered this court's decision in *Union Pacific Railroad v. Dept. of Rev.*, 315 Or 11, 843 P2d 864 (1992), and in particular the following statement:

"'Growth in net cash flows will arise either because the present asset base generates additional income *or because additions to the asset base produce income beyond the cost of the additions themselves*, including the costs of operating them. The latter source of growth will be possible *only if an investor is prepared to forgo some immediate return on investment (i.e., an amount equal to the cost of the new income-producing assets) in order to experience more satisfactory returns in the long run.* If the net cash flows generated by increases in the asset base do not exceed the cost of the additional asset base and the cost of their operation, then there has been no "growth" from an investor's standpoint.'"

*Level 3 Communications*, 23 OTR at 485 (quoting *Union Pacific Railroad*, 315 Or at 22) (emphasis added in *Level 3 Communications*). The Tax Court concluded that the foregoing is *dictum* because the court in *Union Pacific Railroad* had accepted the taxpayer's argument that its revenue did not grow during the tax year at issue. However, the Tax Court found it notable that this court had expressed no concern about considering revenues from property to be acquired in the future. In the Tax Court's view, the foregoing statement reflected this court's apparent conclusion that Oregon law allows the department to consider future additions to the asset base in estimating future cash flows, even though those additions will occur only if investors (shareholders and lenders) invest more money in the company itself. *Level 3 Communications*, 23 OTR at 485. The Tax Court acknowledged that *Union Pacific Railroad* is not, strictly speaking, precedent for how to value centrally assessed property, but, it stated, the decision indicates that Oregon recognizes no legal barrier to considering the cash flow generated by future properties and supports the conclusion that an attribute that attracts outside investment in the company may be included in the value of the unit of property as intangible property. *Level 3 Communications*, 23 OTR at 485-86.

The Tax Court stated that the potential for revenue growth can derive from an attribute of the unit of assembled equipment, real property, customer relationships, and workforce in place, or from the ability of the company to attract merger partners or additional capital investment, or from a combination of those factors. It also concluded that the legislature had fully intended that some or all those factors would be considered in the valuation of the unit of real, tangible, and intangible property in place on any given assessment date. *Id*. For those reasons, the Tax Court rejected Level 3's argument that no revenue growth is attributable to its operating property under the income approach.

Finally, the Tax Court observed that Level 3's sole objection to the use of the investment attributes in valuing its property was the legal argument that central assessment statutes do not permit the department to rely on them as

indicators of the value of the company's property. *Id.* at 486-87. Level 3 did not disagree with the department's factual conclusion as to the value of the investment attributes, it did not present a factual objection to the specific effect of any particular investment attribute on the value of the property, and it did not challenge the department's projections for growth. Accordingly, the Tax Court accepted the department's determinations of revenue growth rates for the tax years at issue under the income approach to value. *Id*. at 486-88.

The Tax Court then turned to consider the other two approaches to determining real market value—the cost approach and the market approach. Both parties had performed an analysis of value using the cost approach. As this court explained in *Delta*, "[t]he cost approach to value is based upon the principle of substitution, that is, it assumes that property is worth its cost or the cost of a satisfactory substitute with equal utility. Thus, the cost approach seeks to determine the cost of the unit that is being valued." 328 Or at 605. The department gave "the least reliance" to the cost approach compared to the income and market approaches, and Level 3 assigned it no weight in its overall conclusion of value. In addition, Level 3 argued that the department's cost approach valuation was flawed in various respects. The Tax Court agreed with Level 3 that the department's valuation under the cost approach was unreliable, and, therefore, it assigned no weight to either party's proffered result under the cost approach. *Level 3 Communications*, 23 OTR at 494. Neither party challenges that part of the Tax Court's decision in this court.

Finally, the Tax Court addressed the market—or comparable sales—approach, which relies on the price at which similar properties have sold in arms-length transactions. *See Seneca*, 363 Or at 799. As the Tax Court observed, the market approach is difficult to apply when valuing the property of large enterprises, such as Level 3, because comparable units of property are rarely sold. *Level 3 Communications*, 23 OTR at 494-95. To address that problem, appraisers use a "stock and debt" valuation method, in which the value of a company's stock and debt is used as a proxy for the value of the property that the company

holds. *See* OAR 150-308-0695 (referring to market approach as "stock and debt approach[]"). As this court stated in *Delta*, the stock and debt valuation method is "based upon the premise that the value of assets is equal to total liabilities plus equity *** [and] assumes that the market value of a company's assets can be imputed from the market value of its equity and debt." 328 Or at 606; *see also PP&L v. Dept. of Rev.*, 308 Or 49, 55-56, 775 P2d 303 (1989) (approving use of stock and debt valuation method as substitute valuation technique when no comparable sales available).

As we have stated, Level 3 performed no analysis using the market approach. The Tax Court observed that Level 3 had entirely rejected the market approach and, specifically, the stock and debt valuation method, for all the same reasons that it had objected to the department's unit valuation using the income approach. Specifically, as it had with respect to the income approach, Level 3 argued that stock prices reflect the value to investors of people, reputation, and expectations of profitability of future assets and investments, among many other things, and, it contended, those things are not taxable because they are not "property" that a company owns, holds, or uses. The department, for its part, performed a market approach analysis using the stock and debt valuation method and placed significant and secondary reliance on that approach. Level 3 criticized the department's market approach analysis for including the value of investment attributes in the appraisal and for valuing Level 3's business as a "going concern."

The Tax Court rejected Level 3's arguments about the department's market approach analysis without discussion, on the ground that the court's analysis of the income approach had established that, for central assessment purposes, it is permissible for appraisers to consider the value of the enterprise as a proxy for the value of the property that the company uses or holds. *Level 3 Communications*, 23 OTR at 495-96. The court also noted that, beyond urging rejection, Level 3 offered no alternative computations of value under a stock and debt approach. *Id.* Accordingly, although the department's appraisers reached substantially higher conclusions of value using the stock and debt approach than they had using the other two approaches, the Tax Court

generally accepted the overall validity of the department's stock and debt analysis. *Id.*

## II.  ANALYSIS

A.  *The Tax Court did not conclude that Oregon taxes business enterprise value.*

On appeal, Level 3 does not challenge the department's appraisers' specific determinations of value. Rather, it asserts that the Tax Court erroneously "held that the [central assessment] statutory scheme permitted taxation of the entire enterprise value of the company itself in the hands of its shareholders." Level 3 argues that that "holding" directly conflicts with the unambiguous text of the statutes, which, it contends, demonstrates that the legislature intended to tax only the property that a company uses or holds on a particular assessment date for the purpose of engaging in certain industries, not the enterprise value of the company itself. For that reason, according to Level 3, the Tax Court also erred in accepting the department's appraisals, which were based on the enterprise value of the company.

Level 3 provides ample authority to establish the proposition that the legislature intended central assessment to tax the value of a company's property and not the enterprise value of the company, including, as described above, pointing to this court's statements in *Delta* and *Comcast* to the effect that the department is tasked with assessing the value of a company's property, not the value of the company as a firm. We need not summarize that authority here, because that proposition is not in dispute. Both the department and the Tax Court agree that, under the central assessment scheme, a company's property, and not the company itself, is subject to taxation.

Level 3's argument that the Tax Court held to the contrary is based on a misreading of the court's opinion. Level 3 points to the following statement by the Tax Court:

> "Overall, regarding Taxpayer's legal question, the court concludes that Oregon's central assessment law does not dictate a specific valuation method, but it certainly does not stand for the proposition that use of the value of the

company or its shares of stock as an indicator of, or proxy for, value is invalid as a matter of law. *The court sees no indication in the statutory text or context that the legislature has imposed any legal requirement to distinguish between the value of the company to its shareholders and the value of all of the company's tangible and intangible property. Indeed, the legislature has blurred the line between a centrally assessed company and the property it uses, most notably by incorporating into the definition of 'property' a corporation's inalienable right to exist.*"

*Level 3 Communications*, 23 OTR at 481-82 (emphasis added). But, read in context, that statement does not represent the Tax Court's conclusion that the central assessment statutes permit taxation of the enterprise value of a company. Rather, as we explained above, the Tax Court considered whether and to what extent the value of the company, including what the parties referred to as "investment attributes" that inhere in stock ownership—such as the possibility of acquiring future tangible and intangible property, the present value of a company's growth opportunities, and potential mergers and acquisitions—may permissibly inform a determination of the unit value of centrally assessed property under accepted approaches to valuation. In the foregoing passage, the court reiterated its conclusion that the department may use the value of the company or the investment attributes as reliable indicators of the value of a company's taxable property under certain circumstances. Accordingly, we reject Level 3's argument that the Tax Court erroneously understood that Oregon imposes a tax on the enterprise value of a company subject to central assessment.

Stripping away that misreading of the Tax Court's opinion, Level 3's core argument is that the valuation of "property" that is "used or held" by a company, as provided in the central assessment statutes, cannot be based on an appraiser's consideration of either the company as a whole or so-called investment attributes such as expectations for future revenue growth based on future acquisitions of equipment and mergers with other companies. According to Level 3, those items are indicators of the enterprise value of the company, but not of the value of the property that the company uses or holds on the assessment date. Thus, the

primary issue before this court is whether the Tax Court erred in accepting the department's income and market approach valuations of Level 3's property when those valuations were based in part on those indicators. We conclude that the Tax Court did not err in concluding that the central assessment statutes permit the department to rely on the value of a company as a whole and investment attributes such as the possibility of acquiring future tangible and intangible property, the present value of its growth opportunities, and potential mergers and acquisitions, as reliable indicators of the value of a company's property for central assessment purposes.

B.   *The Tax Court did not err in concluding that the enterprise value of the company can inform a determination of a centrally assessed company's taxable property.*

Oregon's central assessment statutes are codified in ORS 308.505 to 308.665. As did the Tax Court, we begin with ORS 308.515(1)(h), which requires the department to "make an annual assessment of *any property* that has a situs in this state and that *** is used or held for future use by any company in performing or maintaining" any of certain type of businesses, including communication business. (Emphasis added.) "Property" is a defined term for purposes of ORS 308.505. Under ORS 308.505(14), the term "property"

"(a)   Means all property of any kind, whether real, personal, tangible or intangible, that is used or held by a company as owner, occupant, lessee or otherwise, for the performance or maintenance of a business or service or for the sale of a commodity, as described in ORS 308.515;

"(b)   Includes, but is not limited to, the lands and buildings, rights of way, roadbed, water powers, vehicles, cars, rolling stock, tracks, office furniture, telephone and transmission lines, poles, wires, conduits, switchboards, machinery, appliances, appurtenances, docks, watercraft irrespective of the place of registry or enrollment, merchandise, inventories, tools, equipment, machinery, franchises and special franchises, work in progress and all other goods or chattels; and

"(c)   Does not include items of intangible property that represent:

"(A)   Claims on other property, including money at interest, bonds, notes, claims, demands or any other evidence of indebtedness, secured or unsecured; or

"(B)   Any shares of stock in corporations, joint stock companies or associations."

As the Tax Court pointed out, that definition is extremely broad, referring to "all property of any kind, \*\*\* tangible or intangible."

Centrally assessed property may be subject to unit valuation, as provided in ORS 308.555:

"The Department of Revenue, for the purpose of arriving at the assessed value of the property assessable by it, may value the entire property, both within and without the State of Oregon, as a unit. If it values the entire property as a unit, either within or without the State of Oregon, or both, the department shall make deductions of the property of the company situated outside the state, and not connected directly with the business thereof, as may be just, to the end that the fair proportion of the property of the company in this state may be ascertained."

Central assessment actually had its origins in unit valuation, which was devised well before the enactment of Oregon's central assessment statutes to address the difficult task of valuing the property of a business as a going concern when the property of the business is located in more than one taxing district. *Comcast*, 356 Or at 289.

This court has explained that central assessment goes beyond valuation of only the tangible property of a business. In *Comcast*, the court noted:

"Central assessment also allowed assessors to capture additional value inherent in certain property. In particular, central assessment made possible assessments which would reach those large intangible values, called franchise value or good will, which could not be effectively taxed by local assessors."

*Id*. at 290 (internal quotation marks omitted). The court quoted with approval the following passage from *Cleveland*

*Railway Co. v. Backus*, 154 US 439, 444, 14 S Ct 1122, 38 L Ed 1041 (1894), in which the Supreme Court explained, essentially, that central assessment does not simply tax a company's tangible property in a given state:

> "The true value of a line of a railroad is *** the aggregate of those values plus that arising from a connected operation of the whole, and each part of the road contributes not merely the value arising from its independent operation, but its mileage proportion of that flowing from a continuous and connected operation of the whole."

And in *DISH Network Corp. v. Dept. of Rev.*, 364 Or 254, 434 P3d 379 (2019), this court recently observed that "there is no bar on taxing the intangible property of the centrally-assessed companies whose property may be subjected to unitary valuation" and conveyed the same concept that was explained in *Comcast*:

> "[U]nit valuation as permitted by ORS 308.555 is not at bottom just a different way of valuing a company's tangible property. Unit valuation actually values the company as a going concern: It considers a company's market value as a whole and does not, either in practice or in theory, purport to assess the various component parts that go into that whole."

*Dish*, 364 Or at 292. In other words, unit valuation can capture intangible values inherent in a company's system-wide network of property.

Nonetheless, Level 3 maintains that the Tax Court erred in concluding that the central assessment statutes allow the department to rely on the enterprise value of a company in determining the value of a company's tangible and intangible property. Level 3 contends that relying on the enterprise value of the company as an indicator of the value of the company's property is equivalent to taxing the value of the company, and that is not permitted by the statutes. For that reason, it objects to the department's appraisals under the income approach and the market approach, as they each considered the value of the company as a whole in determining the value of the company's taxable tangible and intangible property.

As the Tax Court explained, the text of ORS 308.545 suggests that the legislature intended to allow the department to consider the value of the company's stock and debt and the amount of the company's income when determining the value of all of the company's tangible and intangible property. That is, by allowing the department to take into consideration the annual statements that a company files under ORS 308.525, which disclose the company's stock value, company income, and other items, and by expressly stating that the department may consider "the earning power of the company" as well as the "franchises and special franchises" owned or used by the company, the statute appears to allow the department to consider the value of the company's stock and debt and the amount of the company's income when valuing the company's property.

In addition, we agree with the Tax Court that legislative history, including legislative developments in Oregon before 1909 as well as decisions of the United States Supreme Court and this court predating the enactment of the central assessment statutes, confirm that interpretation. Before the enactment of the central assessment statutes, the United States Supreme Court had repeatedly suggested that the value of the total shares of a company's stock held by its shareholders was an appropriate guide to determining the value of a company's tangible and intangible property in a state. In addition, eight years before the enactment of Oregon's central assessment statutes, this court, in *O. & C. R. R.*, indicated its approval of a stock and debt approach to valuation. Based on that background, and considering that nothing in any of the amendments to the central assessment statutes since their enactment suggests an intention to preclude the use of a company's value to its shareholders as a proxy for or indicator of the value of the company's tangible and intangible property, we conclude that the Tax Court was correct to reject Level 3's argument that that valuation method is impermissible under the statutory scheme.

We thus agree with the Tax Court's interpretation of the central assessment statutes, based on its review of the text, context, and legislative history of those statutes. We also note that the stock and debt indicator of value is commonly

used in unit valuation. Indeed, a department rule, OAR-150-308-0690, adopts the 2009 Western States Association of Tax Administrators Appraisal Handbook (WSATA Handbook) as the department's official valuation guide for centrally assessed property, and the WSATA Handbook, in turn, provides for property to be appraised using the stock and debt valuation method. *See* Western States Association of Tax Administrators Committee on Centrally Assessed Property, *Appraisal Handbook: Unit Valuation of Centrally Assessed Properties* (2009). The WSATA Handbook explains that, as a matter of basic economic theory, "the total value of a firm's assets is equal to the total value of its liabilities, including stockholders' equity." *Id.* at IV-1. That is because "[f]irms purchase assets using equity or debt financing," and, therefore, the value of the assets should equal the value of the equity and debt. *Id.* The WSATA Handbook traces the history of the stock and debt indicator of value back to 1875 and states that it "has been commonly used in unitary valuation for tax purposes." *Id.* at IV-1-4.

To summarize, the text of the central assessment statutes requires the department to value all of the company's property (with exceptions not applicable here),[10] and nothing in the statutes' text suggests that it is impermissible for the department or the Tax Court to consider the enterprise value of the company under the income approach, or the stock and debt of a company under the market approach, when determining the value of a company's tangible and intangible property for central assessment purposes.

C.   *The Tax Court did not err in concluding that "investment attributes" can be used to value taxable intangible assets.*

Level 3 also contends that the Tax Court erred in considering the investment attributes as indicators of, or proxies for, the value of the company's taxable property

---

[10] Level 3 argues that the statutory exclusion from the definition of property for "shares of stock in corporations" points in a different direction, but that argument is misplaced. As this court has stated, "[t]he exclusion of 'shares of stock' applies only to investment securities, not to a controlling stock interest in a corporation doing [the centrally assessed] business." *Southern Pacific Trans. Co. v. Dept. of Rev.*, 295 Or 47, 62-63, 664 P2d 401 (1983). Level 3's own stock is not a stock investment in another company.

because they are not intangible property "used or held" by the company for use in the business under the definition of the term "property" in ORS 308.505(14). We again disagree with Level 3.

As Level 3 acknowledges in its brief to this court, the appraisals that it offered to the Tax Court were predicated on the facts that its tangible property became obsolete and declined precipitously in value after installation and that, as a company, its only prospect for future growth depended on its ability to expand its network through procurement of new property or acquisition of other companies with their own fiber optic networks. In other words, Level 3 acknowledged that its appraisals focused only on the value of Level 3's tangible property. Level 3 concedes, as it must, that intangible property also is subject to central assessment, but it does not explain what sorts of intangible property it considers to be taxable. Rather, it confines itself to arguing that investment attributes such as the possibility of acquiring future tangible and intangible property, the present value of its growth opportunities, and potential mergers and acquisitions are not intangible property of the company because they are not "used" or "held" by the company.

By looking only at the value of Level 3's soon-to-be-obsolete tangible assets, Level 3's appraisers ignored the value of the intangible assets that the management of the company relied on to ensure the company's continued growth. As we have stated, one core purpose of unit valuation is to "capture additional value inherent in certain property," reaching "those large intangible values, called franchise value or good will, which could not be effectively taxed by local assessors." *Comcast*, 356 Or at 290 (internal quotation marks omitted). The income approach to valuation, for instance, attempts to discern the value of Level 3's existing tangible and intangible property by capitalizing the net present value of an estimated future income stream. Some of the intangible assets that Level 3 possessed as a company were the ability to make efficient and ready use of large purchases of new equipment in the future, which other companies may not possess; the ability of its management team to deal with the obsolescence of its tangible property and to meet the company's future needs; and an existing

customer base that would purchase a continually increasing volume of network capacity. That is, Level 3 had the ability to convert future purchases into valuable assets, and that ability is part of what made Level 3 profitable. The present value of that investment attribute was an asset of the company or, in other words, "property" that Level 3 used "in the performance or maintenance" of its business under ORS 308.505(14).

## III.   CONCLUSION

In sum, we reject Level 3's premise that the Tax Court held that there is no legal distinction between the value of the company itself and the property used or held by the company in the performance of its centrally assessed business on the assessment date. In addition, Level 3 has not persuaded us that the Tax Court erred in concluding that the central assessment statutes permit the department to rely on the enterprise value of a company and investment attributes such as the possibility of acquiring future tangible and intangible property, the present value of its growth opportunities, and potential mergers and acquisitions, as reliable indicators of the value of a company's property for central assessment purposes.

Because Level 3 did not otherwise dispute that the Tax Court's conclusions were supported by substantial evidence in the record, we affirm the decision of the Tax Court. ORS 305.445 ("The scope of the review of either a decision or order of the tax court judge shall be limited to errors or questions of law or lack of substantial evidence in the record to support the tax court's decision or order.").

The judgment of the Tax Court is affirmed.